UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

SUNG D. KIM,                                                                    **Docket No.:** cv-19-3264

                                        Plaintiff,

                -*against*-

COUNTY OF NASSAU, and NASSAU COUNTY            **COMPLAINT**
POLICE DEPARTMENT, FORMER ACTING
POLICE COMMISSIONER THOMAS KRUMPTER,
in his individual and official capacity, SERGEANT
TARA COMINSKEY, and POLICE OFFICER BRIAN
MONK,

                                        Defendants.            **JURY TRIAL IS DEMANDED**
-------------------------------------------------------------X

        **PLAINTIFF**, **SUNG D.  KIM**, by and through his attorneys, The Law Offices of Frederick

K. Brewington, as and for his Complaint as of right against the Defendants COUNTY OF NASSAU,

NASSAU COUNTY POLICE DEPARTMENT, THOMAS KRUMPTER (Former Acting Police

Commissioner), SERGEANT TARA COMINSKEY, and POLICE OFFICER BRIAN MONK,

respectfully sets forth:

                        **PRELIMINARY STATEMENT**

        1.      This is a civil action seeking monetary relief (including humiliation, embarrassment,

past and on going economic loss), injunctive relief, declaratory judgment, compensatory and punitive

damages, disbursements, costs and fees for violations of the Plaintiffs' rights, brought pursuant to

*42 U.S.C.* § 1981, *42 U.S.C.* § 1983, 2nd Amendment and the Equal Protection Act of the 14th

Amendment to the United States Constitution, Article 15 of the Executive Law of the State of New

York (Human Rights Law) Section 290 and 296, and award of attorney's fees/cost pursuant to *42

U.S.C.* § 1988.

2.      In this action, Plaintiff, who is a retired Police Officer of the Nassau County Police Department, seeks declaratory and injunctive relief and damages, arising from the intentional actions of the Defendants in violating Plaintiff's rights, denying equal and proper treatment and discriminating against him because of his Asian race and Korean national origin, as a result of the Defendants failing/refusing to provide equal treatment, failing to provide due process, failing to honor Plaintiff's rights to bear or carry arms and in doing so, preventing the issuance of hand gun/pistol licenses and denying "good guy" letters to Plaintiff, due to his race and national origin, and for the retaliatory employment practices, forced resignation, and for creating a hostile work environment.

3.      Plaintiff alleges that Defendants COUNTY OF NASSAU and NASSAU COUNTY POLICE DEPARTMENT negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of, *inter alia*: [1] His job as a Police Officer at the Nassau County Police Department; [2] his freedom to complain of harassment and discrimination without retaliation; [3] his 14th Amendment right; [4] the terms, conditions and privileges of his citizenship; [5] his freedom to wilfully retire and/or to quit working in his assigned role at Nassau County Police Department; [6] his right to be free from discrimination; [7] his right to be treated equally regardless of Plaintiff's race/color and national origin; and [8] personal safeties, through unlawful violation of laws, violation of rules, differential treatment, discrimination, retaliation, harassment on the basis of race/color and national origin.

4.      Defendants herein purposefully and intentionally sought to deprive Plaintiff of, *inter alia*: [1] rights to be issued permits/licenses to own, possess and/or carry hand guns and/or pistols; [2] rights to good faith determination as to his respective rights to carry arms; [3] rights afforded his

as a retiring member of the Nassau County Police Department; [4] his right to equal protection and/or to be free of discrimination and retaliation based upon his protected classes; [5] rights to property and ability to provide personal safety for himself; [6] right to due process; [7] right to be free from limitations being placed on his ability to earn additional income; [8] his right to a fair, equal, and good faith determination as to his employment and/or suspension status; [9] his right to a good faith determination as to disciplinary actions leveled against him.

5.      Said acts were done knowingly with the consent and condonation of the COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, and FORMER ACTING POLICE COMMISSIONER THOMAS KRUMPTER with the express purpose of harming Plaintiff, infringing upon Plaintiff's property rights, retaliating against Plaintiff for belonging to a protected class of individuals who are of the  Asian race and a Korean national origin, removing Plaintiff from the same level as other police officers and employees at Nassau County Police Department, retaliating against Plaintiff for complaining about harassment and discriminatory treatment; and violating Plaintiff's rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

7.      Venue herein is proper under 28 U.S.C. § 1391(b); the cause of action arose in the Eastern District of New York - specifically, in Nassau County.

8.      This Complaint is being brought pursuant to 42 U.S.C. §§ 1981, 1983, 2nd Amendment and the Equal Protection Act of the 14th Amendment to the United States Constitution the Equal Protection Act of the 14th Amendment to the United States Constitution, Article 15 of the

Executive Law of the State of New York (Human Rights Law) Section 290 and 296, and for employment discrimination by Defendants on the basis of race and color and national origin

### PARTIES

9.  SUNG D. KIM, (hereinafter either "Mr. Kim" or "Plaintiff") is an Asian American man of South Korean ancestry, and is a citizen of the United States and resident of the State of New York. Plaintiff was employed and/or formerly employed by Defendants COUNTY OF NASSAU in the NASSAU COUNTY POLICE DEPARTMENT as a Police Officer at all times relevant to the Complaint. Plaintiff suffered and/or was caused to suffer humiliation, retaliation, discrimination and physical and emotional injuries to his hand while employed with Defendants.

10.  Upon information and belief, Defendant COUNTY OF NASSAU (hereinafter "COUNTY") is a duly constituted municipal corporation of the State of New York. Upon information and belief, the COUNTY formed and has direct authority over several individual departments including Defendant NASSAU COUNTY POLICE DEPARTMENT. The aforementioned department and/or the employees, agents or representatives of said department are directly involved in violations that are at issue in this Complaint.

11.  During all times relevant in this Complaint the Defendant, NASSAU COUNTY POLICE DEPARTMENT (hereinafter "NCPD") is a department and/or agency of COUNTY operating as part of the COUNTY. Upon information and belief, the NCPD oversees, maintains, manages/supervises, and controls several units, bureaus and employees, including but not limited to the individual Defendants FORMER ACTING POLICE COMMISSIONER THOMAS KRUMPTER, SERGEANT TARA COMINSKEY and POLICE OFFICER BRIAN MONK.

12.  Defendant THOMAS KRUMPTER (former Acting Police Commissioner), (hereinafter "KRUMPTER") at all times relevant to this complaint, served as Police Commissioner

of the NCPD. Upon information and belief, Defendant KRUMPTER is a decision maker and policymaker within the COUNTY. Defendant KRUMPTER is charged with the duties of overseeing the Nassau County Police Department's employees and employee-management relations. Said Defendant also had the authority and power to impact and/or affect some aspect of Plaintiff's compensation, terms, conditions, benefits and/or privileges of employment and employment status within the NCPD and was acting under the color of law, policies, customs, and usages of the State of New York and/or COUNTY, acting in his individual and official capacity.

13.     Upon information and belief, during all times relevant to this Complaint, Defendant SERGEANT TARA COMINSKEY was and is a citizen and resident of the State of New York; at all times herein mentioned was an Officer and the Equal Employment Officer employed by the COUNTY, under the direction of NASSAU COUNTY POLICE DEPARTMENT, FORMER ACTING POLICE COMMISSIONER THOMAS KRUMPTER and COUNTY, and was acting under the color of policies, customs, and usages of the State of New York and/or COUNTY, acting in her individual and official capacity.

14.     Upon information and belief, during all times relevant to this Complaint, Defendant POLICE OFFICER BRIAN MONK was and is a citizen and resident of the State of New York; at all times herein mentioned was a Police Officer employed by the COUNTY, under the direction of NASSAU COUNTY POLICE DEPARTMENT, FORMER ACTING POLICE COMMISSIONER THOMAS KRUMPTER  and COUNTY, and was acting under the color of policies, customs, and usages of the State of New York and/or COUNTY, acting in his individual and official capacity.

## STATEMENT OF FACTS

15.     Sung D. Kim, Plaintiff, who is an Asian-American of South Korean ancestry, began his employment with Defendants County and NCPD on March 11, 2005 as a Police Officer.

16.     Prior to Mr. Kim's employment at the NCPD 5th Precinct, Mr. Kim was employed for eight (8) years with the New York City Police Department.  Hence, there were no questions as to Plaintiff's qualifications regarding his ability to perform his job and at all times during his tenure with the COUNTY OF NASSAU and the NASSAU COUNTY POLICE DEPARTMENT, Mr. Kim performed his duties in an exemplary fashion.

17.     Mr. Kim provided consistent satisfactory performance and service as a professional through the entirety of his twelve (12) year tenure as a NCPD Police Officer.

18.     From the time of Mr. Kim's hiring on March 11, 2005, until his wrongful termination on April 16, 2017, Mr. Kim was subject to disparate treatment, harassment, retaliation, discrimination, violence, verbal abuse, and a hostile work environment, all of which was caused by and allowed to continue by Defendants COUNTY, NCPD, KRUMPTER, COMINSKEY and MONK.  In fact, Defendant MONK was responsible for humiliating Mr. Kim in front of the entire police station on numerous occasions.

19.     Plaintiff was a dedicated Police Officer who performed his duties with great care despite the fact that his work environment was permeated with discrimination, and harassment, and became increasingly hostile and retaliatory over the years.

20.     Defendant PO MONK was a fellow police officer who declared his disdain toward Mr. Kim because of his Asian race and Korean origin, and said Defendant demonstrated this disdain for Plaintiff numerous times and it was evident in his interactions with Mr. Kim.

21.     The COUNTY, KRUMPTER, COMINSKEY and NCPD did nothing to address the growing discontent and in fact supported it by ignoring the complaints filed by Mr. Kim as well as his requests for transfer.  Instead of addressing Mr. Kim's concerns, Defendants encouraged the

behavior of Defendant MONK and retaliated against Mr. Kim for complaining of such.

22.     The Defendants' mutual disdain for the Plaintiff and the discrimination and retaliation he endured became so evasive, that the hatred and contempt of the Officers of NCPD coupled with the complicit, callous disregard of the disparate treatment by Defendants, permeated the environment to such an extent that it culminated in Mr. Kim being physically assaulted by fellow officer Defendant BRIAN MONK and then being punished for it under the guise of a "voluntary retirement" pursuant to a Stipulation of Settlement and Release,  while Defendant MONK was celebrated by Defendants for his attack and allowed to remain on the force.

23.     Then, to add insult to injury, Defendant KRUMPTER'S termination of Mr. Kim made Mr. Kim ineligible for  a Letter of Good Standing.  Hence, upon his "retirement", Mr. Kim was not issued a  "Good Guy Letter" which would allow Mr. Kim to possess and carry a pistol as a retiree.

24.     The decision to terminate Mr. Kim, which led to the denial of a "Good Guy Letter," was made by the FORMER ACTING POLICE COMMISSIONER, Defendant THOMAS KRUMPTER, who was fully aware of the harassment and discrimination Plaintiff endured at the hands of his fellow officers, especially Defendant MONK.

25.     Then as if Mr. Kim's termination and denial of a "Good Guy Letter" was not enough, Mr. Kim learned, on January 29, 2019, when he requested a copy of his Training History Report from the State of New York Division of Criminal Justice Services, that his New York State Basic Training Certification with Firearms,  had been revoked.

26.     Upon information and belief, basic training is often considered to be the most important learning experience that a police officer completes during his or her career.  Revoking Mr. Kim's certification would and has prevented Mr. Kim from carrying a firearm for protection and/or to attain employment as a Security Guard, or Peace Officer, or any employment which requires that

Mr. Kim be armed, as he originally intended.

27.     The revocation of Mr. Kim's State Certification was implicated by the collective Defendants, COUNTY, NCPD, and Former Acting POLICE COMMISSIONER THOMAS KRUMPTER.

28.     On November 25, 2012, Plaintiff was working overtime on a day tour in the Fifth (5th) Precinct, assigned as signal monitor.  Mr. Kim usually worked the night shift.

29.     At some point during the midmorning, Mr. Kim heard the voices of police officers congregating in room thirty-two (32). Plaintiff walked to the doorway of the room to inquire as to what was happening.  Plaintiff noticed Defendant MONK standing near the doorway at the other end of the room. Mr. Kim and Defendant MONK made eye contact, but said nothing to each other.  At that point, Plaintiff returned to his desk to answer the phone.

30.     Within a few moments, Mr. Kim was suddenly and violently knocked off his chair and thrown to the floor approximately three (3) to five (5) feet away from Plaintiff's desk.  Mr. Kim was hit from the right side as if tackled.  Mr. Kim fell to the ground hitting the back of his head and hands, as he landed on the floor.

31.     When Plaintiff regained his senses as to what had occurred, Mr. Kim looked up and noticed Defendant MONK on top of him.

32.     As MONK was on top of Mr. Kim, he was throwing a barrage of punches at Mr. Kim. Plaintiff attempted to block Defendant MONK'S punches by holding Defendant MONK away from himself with one arm while blocking Defendant MONK'S punches with the other arm. After a few seconds, Plaintiff was finally able to grab hold of Defendant MONK's vest in an attempt to get Defendant MONK off of him. This effort was unsuccessful however, as  Defendant MONK was

extremely aggressive and unable to be stopped by Plaintiff.

33.     Eventually Defendant Monk was pulled off of Mr. Kim by Police Officer Casella (PO

Casella).  PO Casella also helped Mr. Kim up off the floor, along with Police Officer Trosko( PO

Trosko).  PO Casella and PO Trosko were both instrumental in keeping  Defendant MONK separate

from Plaintiff.

34.     Defendant MONK continued his aggression  toward Mr. Kim after they were

separated, yelling "this is payback" at Plaintiff.  Understandably upset by the physical attack he just

endured, Mr. Kim responded in further defense of himself,  "you're not a man, you're a pussy, and

if you have a problem with me, let's take it outside."  PO Casella then forcibly took Defendant PO

MONK back through room thirty-two ( 32) and into the hallway because Defendant PO MONK was

refusing to calm down.

35.     Feeling very anxious and dazed about being physically attacked, Plaintiff began to

pace the floor, in an attempt to calm himself down.  While pacing, Plaintiff tripped over the step

leading back to his desk, and fell to the ground.  As he was falling, he hit his hand on the side of the

metal desk.

36.     As Plaintiff stood up, one of the officers, PO Casella or PO Trosko, noticed that

Plaintiff's hand looked swollen and made Plaintiff aware of their observation. An ambulance was

subsequently called and Plaintiff was taken to the hospital. The ambulance was driven by Police

Officer Volpe (PO Volpe),  while an Ambulance Medical Technician remained in the back with Mr.

Kim.  Plaintiff was taken to Franklin General Hospital. Sergeant Davis came to the hospital shortly

afterwards.

37.     As Mr. Kim's adrenaline subsided, the pain in his hand became excruciating. Doctors

later determined Mr. Kim's hand was broken.  Upon information and belief, this was the same hand

Plaintiff landed on when he was attacked by MONK and knocked out of his chair to the ground.

38.     Mr. Kim's hand was placed in a cast, and Plaintiff was given pain killers and released several hours later.

39.     Upon being released from the hospital, Plaintiff was immediately driven back to the station house and was told to report to the Supervisor's office.   PO Volpe was present in the Supervisor's office as well.  An injury report was prepared by the Supervisor and the Member Injury Statement was prepared by PO Volpe. The injury was reported as a line of duty injury and Plaintiff was awarded worker's compensation.

40.     The vicious intentional attack by Defendant MONK caused Plaintiff to be in a state of shock, as Plaintiff did not expect to be attacked by the very people Plaintiff served with.  As a result of the attack, Plaintiff's fear for his safety increased exponentially, and he was filled with anxiety.

41.     It was at that moment, right after the attack, as Plaintiff gathered himself, that he realized the depth of PO MONK'S racial disdain toward him and the memory of the numerous incidents that Defendant MONK purposefully humiliated Plaintiff in front of the entire police precinct prior to this day, took on a whole new meaning, as this attack was a true demonstration of MONK's hatred and racial animus toward Plaintiff.

42.      One such incident which occurred prior to the November 25, 2017 attack, was when pictures of Long Duck Dong, from the movie Sixteen (16) Candles were  posted in and around the station house.  Upon seeing the pictures, Mr. Kim was highly offended as this character is a name used to mock and ridicule people of Asian descent and the character is highly offensive to the people of the Asian race because it displays racial stereotypes of Asian people.

43.     Upon information and belief, Defendant MONK informed Mr. Kim that he posted

the pictures of the character, but not the other pictures which were displayed in room thirty-two (32).

44.     At the time when Defendant MONK posted the pictures of "Long Duck Dong," Plaintiff feared for his safety and personal security and felt that there would be a confrontation at some point, but he never thought it would reach this heightened level of animosity toward him where he would be physically assaulted.

45.     This is why Plaintiff requested to be transferred numerous times.

46.     Upon Plaintiff's return to work in February 2013, after the attack and broken hand, Plaintiff was placed on restricted assignment due to his hand injury, and in September 2013, Plaintiff requested a squad change as well.

47.     For the eight (8) years Plaintiff worked with the NCPD, Plaintiff was assigned to the Fifth (5th) Precinct.  While at this Precinct, Plaintiff endured multiple racially discriminatory incidents of which Plaintiff was the target, dating back to 2005.

48.     All of these incidents created tension in Mr. Kim's work environment, and made it hostile and uncomfortable. Plaintiff reported a number of these incidents to the Equal Employment Officer, Defendant SERGEANT TARA COMISKEY ('SGT. COMISKEY"), following NCPD and EEO policies and procedures regarding complaints of discrimination and harassment,

49.     Unfortunately, Defendant SGT. COMISKEY did not take Mr. Kim's allegations seriously nor did she in turn follow Defendant's policies and procedures regarding complaints of discrimination and harassment.  As a result, no action was taken to investigate, suspend, discipline, address or remedy the wrongful actions complained of.

50.      In fact, Defendant SGT. COMISKEY dismissed Mr. Kim's complaints and told him that his allegations "were not severe or pervasive" and "you should try writing more summonses if

11

you want a transfer." Mr. Kim's complaints were never addressed as she failed to follow proper protocol pursuant to EEO policies and procedures, which required that she report the complaints to the director. Upon information and belief, Defendant SGT. COMISKEY never notified Plaintiff of any disposition of the complaints as per department procedure.

51.     Following the attack by Defendant MONK, Plaintiff was subjected to a Disciplinary Hearing even though Plaintiff was the one who was attacked. The matter of Mr. Kim's hand injury and how it occurred, was the focus of the hearing as Defendants attempted to shift the cause of Plaintiff's injuries to Plaintiff. Plaintiff also had to defend himself against accusations regarding the physical attack on Plaintiff by Defendant PO MONK.

52.     The hearing commenced on June 5, 2015 and concluded with a recommendation from the Hearing Officer for a four (4) month suspension for both Defendant MONK and Plaintiff.

53.     This decision was completely unwarranted, as Plaintiff was being penalized for being attacked and harassed by a fellow officer who disliked Mr. Kim because of his Asian race and Korean origin, and now Plaintiff was being treated unfairly by the NCPD as well.

54.     Any other officer who was unjustifiably attacked and harassed by a fellow officer in the manner Mr. Kim was, would not have been disciplined. In fact, if Mr. Kim had attacked Defendant MONK in any way, he would have been severely disciplined to the point of termination, but PO MONK was not, and this decision was made because Plaintiff is an Asian-American man from South Korea.

55.     The situation was further exacerbated when the then Acting Police Commissioner, Defendant THOMAS KRUMPTER, disregarded the recommendation of the Hearing Officer and decided to wrongfully terminate Mr. Kim, coercing and forcing Mr. Kim to sign a "Stipulation of Settlement and Release" guaranteeing Plaintiff's termination on or within 30 days of April 16, 2017.

12

56.     KRUMPTER refused to impose the hearing officer's official recommendation that although Plaintiff's attorney and the Police Benevolent Association requested numerous times that KRUMPTER do so.

57.     Upon information and belief, Plaintiff was forced by the Commissioner to sign the "Stipulation of Settlement and Release."  Plaintiff was told by Defendant KRUMPTER that if he wanted to remain on the force the next four (4) months in order to complete the twenty (20) year requirement to receive Plaintiff's full pension benefits, he had to sign the stipulation.

58.     Since there was no basis for his termination, Plaintiff contested this level of coercion and asked his union Representative, what would happen if he did not sign the document.  Plaintiff was told by Defendant KRUMPTER that he would then be terminated immediately and thus Plaintiff would lose all of his twenty (20) years of service.

59.     Hence, fearing the worst, and thus succumbing to the fear and pressure of the coercion mounted upon Plaintiff by Defendants KRUMPTER and NCPD, to sign the stipulation and in essence cover up the EEO complaints,  Mr. Kim, under extreme duress, hesitatingly signed the document on December 23, 2016, which thus effectuated his subsequent termination and forced retirement on April 16, 2017.

60.     Plaintiff's attacker, Defendant PO MONK is a white male who was given the preferred treatment because of his white male status.  As opposed to being terminated like Mr. Kim, he was given the Hearing Officer's recommended four (4) month suspension which was also recommended for Mr. Kim, and then transferred to Police Headquarters.

61.     This was the decision of Defendant KRUMPTER, the Acting Commissioner at the time, who was fully aware of the harassment and discrimination Plaintiff endured at the hands of his fellow officers, and the NCPD, especially Defendant MONK.

62.     Then to pour salt onto the very deep wounds, Defendant KRUMPTER continued the harassment and discriminatory treatment of Plaintiff by refusing to issue Mr. Kim a "Good Guy Letter" also known as a Letter of Good Standing.

63.     Upon information and belief, when the time came for Plaintiff's retirement he could not apply for a pistol permit and a "Good Guy Letter" from the NCPD, which would allow him to possess and carry a pistol as a retiree, due to his termination, which in effect ,made him ineligible.

64.     Defendant KRUMPTER was the individual responsible for issuing Letters of Good Standing also known as "Good Guy Letters", to retiring police officers who requested such a letter. These letters are given to officers upon retirement, who are in good standing and who are free of any mental disabilities or any illness which would prevent the Officer from properly securing or operating a fire arm according to the governing standards for doing so.

65.     Plaintiff's application was, upon information and belief, summarily denied by Patrick Ryder.  Defendant KRUMPTER'S sole reason for denying Plaintiff the issuance of a "Good Guy letter" was for no other reason than the fact that Plaintiff is of the Asian race and South Korean ancestry, and because Plaintiff exercised his right and in doing so, filed complaints pursuant to EEO policies and procedures about the harassment and discriminatory treatment he was subjected to by the Defendants NCPD, COUNTY, KRUMPTER, COMISKEY and MONK.

66.     Plaintiff, Mr. Kim, was an officer of high moral character who did not suffer from mental disabilities and/or physical impairments that would adversely affect his ability to own, operate and/or secure a firearm. Yet the termination by the NCPD placed an automatic stain on Mr. Kim's record which insinuated that Mr. Kim did not leave the NCPD in good standing.  Thus, his twenty (20) years of dedicated and reputable service was wiped away in an instant.

67.     Plaintiff, Mr. Kim did not meet the criteria for any of the restrictions regarding his ability to own or operate a firearm, pursuant to *New York Penal Law* § 400, which governs the issuance of licenses to carry or possess firearms.

68.     Furthermore, issuance of the "Good Guy Letter" is a ministerial task.  Hence, absent proof that Mr. Kim was ineligible for a pistol permit, he should have been issued a "Good Guy Letter" upon request.

69.     According to the Nassau County Pistol License Manual, Rev. Feb. 2015, section 5B:

5. Retired Police Officer/Federal Law Enforcement Officer License

b. Letter of Good Standing: A letter from the law enforcement agency from which the applicant retired, stating that the applicant retired in good standing, is an absolute pre-requisite to the issuance of a Retired Police Officer/Federal Law Enforcement Officer License. (See Nassau County Pistol License Manual, Rev. Feb. 2015, Page 15)

70.     Mr. Kim did not have any mental disability or illness which would have prevented him from properly operating and/or securing a fire arm.

71.     Plaintiff is and was an officer in good standing at all times relevant to this complaint. Thus, deprivation of his property rights and his lawful ability to possess a pistol upon retirement required governmental due process prior to making that decision.  This did not happen, and instead, Plaintiff's Due Process rights were violated as this decision was effectuated without giving him an opportunity to defend himself.

72.     Upon retirement, Plaintiff was not given a "Good Guy Letter", and to add more insult to injury, he was also denied termination pay, pay for his unused sick and vacation time which was accumulated at the time of retirement, and he was restricted to the use of only ten (10) sick days between the time Plaintiff signed the agreement on December 23, 2016 and the date of his "termination" on April 17, 2017.

73.     Such denials equate to violations of Plaintiff's civil and constitutional rights, including, but not limited to the 2nd Amendment, 14th Amendment, Equal Protection, and protection from discrimination and retaliation predicated upon the protected classes.

74.     Defendant KRUMPTER denied Plaintiff the Letter of Good Standing on the sole basis of Plaintiff's race, color, and national origin and in retaliation for having filed complaints as to retaliatory and discriminatory treatment as an Asian man with South Korean ancestry.

75.     Plaintiff suffered severe acts of retaliation for following EEO protocol and reporting the multiple incidents of harassment he endured while employed at the NCPD, while Defendant MONK , Mr. Kim's attacker, received preferential treatment for his violative behavior.  As a male white officer, he was granted the recommended four (4) month suspension without pay, while  Mr. Kim, the only Korean police officer on the force, was terminated.

76.     There were numerous instances when Mr. Kim was subjected to racist statements, and discriminatory and retaliatory acts during his employment at the COUNTY and NCPD, by their employees and agents due to Plaintiff's Asian-American race and his Korean national origin.

77.     On one occasion, in or about the latter part of June 2012, prior to the November 25, 2012 incident, Plaintiff was working the night tour when he responded to a call about a larceny.

78.     Plaintiff took the report, then called Case Offense to call a case report.  While Plaintiff  was still on hold, he received an MDT message from another officer, PO. Glenn Santoro, which said there was a "mental aided call on my post".  The message Plaintiff received stated "you're a pale and you're trying to scam by holding on the call."  Plaintiff  responded by telling PO Santoro that Plaintiff  was attempting to call a report. However, PO Santoro continued to deride Mr. Kim with derogatory comments.

79.     Upon information and belief, Police Officer Salvatore Maiello was partnered with PO Glenn Santoro and told Santoro to stop sending MDT messages.

80.     On another occasion, during that same month, on or about June 19, 2012, Plaintiff applied for the Recruitment Section for the Nassau County Police Exam.  Plaintiff  was the only Asian Officer to request the assignment.  Plaintiff felt his Korean background and law enforcement experience would be an asset to the Recruitment Section. However, Plaintiff  was passed over and not even considered for the position.

81.     During the years Plaintiff was an Officer on the NCPD, Plaintiff was requested multiple times to act as a translator for Korean citizens and to assist multiple units in NCPD, but when he requested to join the Recruitment Section of the NCPD, he was denied the opportunity to recruit within the Asian community.

82.     Upon information and belief, Plaintiff's Commanding Officer Depaula, wrote a poor recommendation for Plaintiff to ensure he would not be considered for the position. As a result of that poor recommendation, Mr. Kim was not granted the assignment allegedly "due to low activity."

83.     This was unquestionably done in retaliation to the multiple EEO complaints filed with Defendant SGT. COMISKEY, the EEO Officer.

84.     Upon information and belief, on numerous occasions between 2011 and 2012, prior to Plaintiff's injury, pictures of the former North Korean dictator were posted multiple times, in and around the precinct with Plaintiff's  name written underneath, and insinuating it was either Mr. Kim or Mr. Kim's Uncle. Plaintiff objected and complained each time these pictures were posted, but Plaintiff's objections were ignored and the pictures remained unless Plaintiff removed them himself. As a matter of fact, the pictures got even worse when the new Korean dictator took office. Plaintiff was then referenced as Kim Jong-un's "brother."

85.     These pictures were also posted on the billboard in room thirty-two (32) for every police officer and supervisor to witness.  None of these pictures were reported however, although every police officer and supervisor is obligated, per NCPD policy, to report offensive material.

86.     Upon information and belief, another occurrence took place in June 2013, when someone wrote "very stupid" on the front of Plaintiff's assignment folder.  This had to have been written by a fellow officer because of where the folders are kept in the Precinct.  Plaintiff responded by writing "coward".  When Plaintiff checked his folder a few days later, it was missing with work related documents inside. Plaintiff felt as if he was being setup.  As such, he notified his Supervisor, Sgt. Tim Rooney, who notified Commission Officer Psoinas and the EEO Officer, Defendant COMISKEY.  Plaintiff was then scheduled for an interview via Department email, to take place at the EEO office.

87.     Upon information and belief, Plaintiff was given a new folder, and when Plaintiff checked it a few days later, "I'm a victim lol lol", written on the front cover.

88.     Once again, Plaintiff notified his Sergeant, Sgt. Tim Rooney, and Plaintiff was instructed to take the folder to the EEO interview to discuss the incident.

89.     Plaintiff's folder was replaced once again, and after a few months with no incident, on October 18th, 2013, Plaintiff's folder went missing again.  Plaintiff reported the incident, once again, to the appropriate Sergeants, Sgt. Tim Rooney and Defendant SGT. COMISKEY.

90.     There were a series of incidents which all occurred on one night during the same shift, in September of 2013.

91.     Upon information and belief, Plaintiff was working inside the Policing Center on restricted duty.  It was particularly busy and Plaintiff was assisting a fellow officer, PO Karen Crose

with the signal monitor.   Plaintiff and PO Crose were sitting in room thirty-two ( 32) when a complainant walked in needing to file a harassment report. Plaintiff informed PO Crose that there was a complainant who needed assistance.   PO Crose raised her voice using profanity towards Plaintiff, telling him it was "inappropriate" of him to tell her about the complainant.

92.   The second incident occurred the same night when Plaintiff was sitting in room thirty-two (32), in PO Karen Crose's seating area.  The room was completely full of officers and there were no seats available.  PO Crose, acting with total disregard and disdain, walked into room thirty-two (32) and told Mr. Kim, in front of the other officers,  "get the fuck out of my seat."  Plaintiff  was very embarrassed and upset, but Plaintiff  did not escalate the situation.

93.   The third incident that evening was when PO Crose brought the large garbage pail for the precinct into room thirty-two (32), to clean it out.  She then said to Mr. Kim, once again in the presence of Plaintiff's  fellow officers, "it's your fucking turn to clean out the garbage!"

94.   Plaintiff was humiliated and very upset by these occurrences, as he was demeaned and made to feel like less of a person at that time.  However to avoid a confrontation, Plaintiff  did not escalate the matter and instead chose to maintain his professional demeanor and to follow proper protocol even though he was upset.   Fearful  of  retaliation in light of the already hostile environment, Plaintiff did not initially report the incident.

95.   Plaintiff informed his union representative, Dean Losquandero, of the incidents and again, Plaintiff  requested a squad change to avoid any further confrontations, humiliation and/or embarrassment.

96.   Dean Losquandero, PBA Representative, and the EEO Officer, Defendant SGT. COMISKEY, informed Defendant Commissioner KRUMPTER about the numerous incidents and

Plaintiff's requests for a transfer.  Upon information and belief, Losquandero met with KRUMPTER and asked KRUMPTER to grant Plaintiff's transfer due to Plaintiff's hostile work environment. KRUMPTER'S reply to Losquandero was, "Why should I help him?" "He's a Gook and a malingerer."  He then denied Plaintiff's requests.

97.     Another situation occurred one evening when PO George Theodoropoulos was watching You Tube videos of a news broadcast about the Asiana Airline plane crash, ridiculing the fictitious names of the Asiana Airline pilots.

98.     Upon information and belief, the officer repeatedly played the video showing it to other officers and laughing.  When Plaintiff had the chance to do so, he spoke with the officer in private.  Plaintiff informed the Officer Theodoropoulos that the video was racially offensive and inappropriate.  The officer instantly defended the video by stating the video was not racist, and then disingenuously apologized later on in the day.

99.     At other times, specifically during the year of 2011,  there were false anonymous 911 calls made about "a suspicious looking Asian man in uniform in a dumpster" on Plaintiff's post. These calls were directed at Plaintiff.

100.     Additionally, on December 10, 2010, Plaintiff was called off Plaintiff's post to attend to a matter which involved Plaintiff's physical presence to guard a perimeter in search of a suspect. After Plaintiff and his fellow officers were told to return to their post, Plaintiff stopped by the precinct to drop off some paperwork for a burglary that took place prior to the matter.

101.     Upon information and belief, after Plaintiff dropped off the paperwork and proceeded to exit the lobby PO Catrina Rhatigan came in with her partner, John Wellenreuther  and a detainee. After getting close to Plaintiff, PO Rhatigan  yelled in a very aggressive tone, in the presence of other police officers and supervisors,  "Oh, and by the way this was your fucking post, you fucking pale!"

102. This belligerence both shocked, humiliated and embarrassed Mr. Kim. Hence, Mr. Kim responded, and a verbal altercation arose as a result.

103. Even though PO Rhatigan targeted Plaintiff, an on-duty supervisor, Sgt. Joseph Miller, rushed across the lobby and aggressively approached Plaintiff, getting in his face, and jabbed his fingers three (3) times, in Plaintiff's chest in the presence of other officers, stating, "Shut the fuck up!"

104. This type of behavior is against the Police Department Code of Conduct, as any aggressive contact with an officer at the Precinct is strictly prohibited. Sgt. Miller clearly violated the precinct's protocol. However, out of fear of retaliation, Plaintiff never pursued the filing of any grievance and despite the witnesses who were present, upon information and belief, Sgt. Miller was not given any warnings or disciplined. Upon information and belief, Sgt. Miller told Plaintiff he did not need to apologize, but he "regretted" that Plaintiff received the brunt of his actions.

105. Going further, on April 10, 2017, Plaintiff was told by PO Judge that there was a phone call for Plaintiff. Upon information and belief, when Plaintiff picked up extension 6131 an unknown male caller mocked Mr. Kim in an Asian accent stating "ha ha ha, you won't have a job." "You'll be delivering egg rolls, Gook. Ha ha ha." The caller then hung up abruptly.

106. Mr. Kim did not recognize the voice and PO Judge did not obtain the caller's identity. Plaintiff reported the incident to the new EEO Officer, Nathalie Bell, who began an official investigation. However, Natalie Bell worked with Defendant COMISKEY in the Legal Bureau, and according to Nathalie Bell's husband, Mr. Jonathan Bell, Esq, Ms. Bell and Defendant COMISKEY were good friends and so it would be a conflict of interest for Ms. Bell to conduct the investigation. Thus, once again, Plaintiff's complaint was ignored. Mr. Kim was told this on July 15, 2013, when

he called the Law Offices of Jonathan Bell, looking for Ms. Bell to discuss the violations taking

place at the NCPD.  Prior to Mr. Kim speaking with Mr. Bell, Ms. Natalie Bell did not disclose her

personal relationship with Defendant COMINSKEY to Mr. Kim at anytime.

107.    All these incidents made Plaintiff's  work environment very tense and hostile.  It

became increasingly more difficult for Plaintiff to report to work and to perform his duties as he was

always anxious and fearful about the next confrontation or humiliation he would be subjected to by

his fellow officers and/or supervisors.

108.    Plaintiff  complained on multiple occasions, but the situation worsened, as more

officers began to join in on the discriminatory and retaliatory behavior.  Defendants SGT.

COMINSKEY and Commissioner KRUMPTER were no help.  They simply ignored Plaintiff's

complaints and concerns.

109.    Upon information and belief, Defendant COMINSKEY told Mr. Kim, on one

occasion, "it doesn't make a difference if you go to another precinct because your reputation will

follow you."

110.    Mr. Kim has been discriminated against as a consequence of his race, color and

national origin and has been subjected to verbal and physical abuse by his peers and supervisors,

including Defendant Commissioner THOMAS KRUMPTER.

111.    This discrimination has not only been condoned by the NCPD but also by the

COUNTY as demonstrated by the actions of Commissioner KRUMPTER and Plaintiff's superiors

within the NCPD.

112.    As a result of the discriminatory and retaliatory behavior of the Defendants,  Mr. Kim

has suffered from extreme stress,  anxiety and fear.  Plaintiff's  work environment became a source

22

of hostility and a trigger for anxiety and mental anguish,  to the point where Plaintiff had to seek a psychiatrist and was prescribed medication to help him Kim cope with the situation.

113.    Upon information and belief, Mr. Kim's psychiatrist stated that he is suffering from PTSD, depression and anxiety.

114.    Mr. Kim's efforts to remedy the situation by filing complaints were met with complete resistance and an unwilling spirit that is contrary to the EEO Policy of COUNTY.  It is clear that Plaintiff's concerns were seen as insignificant and that it is acceptable to be subjected to discriminatory and retaliatory action by the COUNTY and the NCPD on account of race and national origin.

115.    Plaintiff  has been embarrassed, harassed, humiliated, discriminated and retaliated against, all while trying to remain professional and to serve the community of Nassau County.

116.    Defendants' actions have caused Plaintiff to suffer and continue to suffer loss of employment, loss of income, loss of employment benefits, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to his reputation.

117.    Mr. Kim applied for a position as a Public Safety Officer and was denied, due to the revocation of his NYS Certification and lack of a "Good Guy Letter", which in essence states that Plaintiff did not retire in good standing.

118.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation.

**DEFENDANTS LACK ANY JUSTIFICATION FOR DENYING PLAINTIFF FROM RECEIVING *A GOOD GUY LETTER* AND ASSOCIATED PRIVILEGES**

119.    Plaintiff herein has the right to possess and to be issued a license to keep and bear arms, as well as the right to carry a pistol and hand gun for his safety.

120.    Upon information and belief, the Nassau County POLICE Department is responsible for issuing pistol licenses in Nassau County. This includes license privileges to own and license privileges to carry and conceal firearms.

121.    Further, when the Nassau County POLICE Department receives applications for gun permits, the Police Department scrutinizes applications and follows-up with applicants' employers and/or former employers in order to make determinations.

122.    Upon information and belief, when the applicant is a former police or peace officer, the Nassau County POLICE Department Pistol Licensing Bureau looks for and heavily considers "Recommendation for Consideration of an Application for a Pistol License for Retiring Peace/Police Officers" and/or  "Good Guy Letter" forms.

123.    Upon information and belief, a license to carry and conceal firearms is more difficult to obtain than just a license to own a firearm and the applicant must demonstrate a particularized need to carry and conceal a firearm in public.

124.    Upon information and belief, a license to carry and conceal firearms are generally granted to law enforcement officers and peace officers, ex-law enforcement officers and ex-peace officers, some security officers, others that transport large sums of money and/or valuable goods, as well as persons who engage in dangerous professions.

125.    Plaintiff herein is a former police officer, who qualifies for a license to carry firearms due to the nature of his former employment.

126.     Defendants are aware that the Plaintiff herein has interacted with dangerous prison inmates as well as members of the community who Plaintiff has arrested during his respective tenure with the Department. Defendants are also aware that many of these inmates return to society outside of the jail when released and are part of the surrounding community. Often, these inmates live among and/or near Police Officers, including Plaintiff herein.

127.     Defendants also know that, as a result of these interactions with inmates, Plaintiff as do many police officers- walk the streets in fear because they walk among the same inmates that they have interacted with during the prosecution of crime. It has been known that retired officers also routinely get into altercations and/or are forced to subdue, report, support, disciplinary charges and criminal charges against these inmates and persons.

128.     Among these prisoners with which Plaintiffs routinely interact, are dangerous gang members who engage in gang activity inside the jail - as well as outside the jail.

129.     Due to the dangerous nature of a Police Officer's job, Police Officers (such as Plaintiff herein) fear for the safety of themselves as well as their families. As such, the need to be issued privileges to carry or own a firearm to protect themselves, their families, and their properties is paramount.

130.     The need to possess privileges are more important for individuals such as Plaintiff, Mr. Kim,  who is no longer an active member of law enforcement and require heightened personal security as a result.

131.     Defendants are aware that both the State and Federal governments recognize the need to afford retired police/peace officers the right to carry firearms as a result of the dangers they each face.

132.    *New York State Penal Law* § 400 authorizes the issuance of permits to carry firearms to retired Police Officers such as Plaintiff Mr. Kim and said section also outlines what is necessary to obtain same.

133.    This section also outlines that which disqualifies individuals from receiving and carrying permits. Defendants are aware that Plaintiff meets all of the qualifications for issuance of a pistol permit under this law/section.

134.    Defendants are aware that *Penal Law* 400 requires that Mr. Kim must have the NCPD sign-off on a "Good Guy Letter", which is to be provided with Plaintiff's application to the Police Department Licencing Bureau.

135.    *19 USC* § 926 - also referred to as the United States Law Enforcement Officers Safety Act of 2004 ("*LEOSA*") - also authorizes the issuance of permits to carry firearms to retired police officers such as Plaintiff, and said section also outlines what is necessary to obtain same. Defendants are aware that Plaintiff meets all of the qualifications for issuance of pistol permit under this law.

136.    In addition, Defendants are aware that, under *LEOSA*, as a matter of well-settled Federal Law, Plaintiff is entitled to carry a concealed firearm in any jurisdiction in the United States regardless of State or local licensing qualifications.

137.    Upon information and belief, the COUNTY OF NASSAU and NASSAU COUNTY POLICE DEPARTMENT has policies, procedures, rules and guidelines regarding the issuance of pistol permits and "Good Guy Letters" to retirees such as Plaintiff.

138.    Defendants, their employees, assigns, representatives, officers, and/or agents, including are required to adhere to the policies, procedures, rules and guidelines regarding the issuance of pistol permits and "Good Guy Letters" to its retirees.

26

139.    Defendants ignore their own policies, procedures, as well as statutes, which all support that Plaintiff is entitled to unrestricted "Good Guy Letters" and/or permits to carry firearms.

140.    By summarily denying Plaintiff's application for a "Good Guy Letter," Defendants are aware that they are placing Plaintiff's life in danger and jeopardy - without reasonable basis of justification. In addition, Defendants have failed to justify their actions or provide any meaningful due process connected to their denials.

141.    Defendants' sole purpose for denying Plaintiff's application for a "Good Guy Letter," placing restrictions in same, for ignoring the law and policy and/or for failing to provide afford Plaintiff his due process right to defend himself, is to harm, discriminate and retaliate against Plaintiff simply because of his race, color and national origin. There is no other reason for Defendant's denial other than to punish Plaintiff for being different.

142.    Plaintiff does not have any type or level of disability that would disqualify him from carrying firearms during his respective retirement or jeopardize the health, well-being and good of the public.

143.    Plaintiff does not have medical or psychological issues that would cause him to be restricted in his ability to carry firearms.

144.    Defendants', including Defendant KRUMPTER's intent, is and was, to discriminate, violate rights and instill ongoing pressure, fear and anxiety in Plaintiff. Defendants do not treat similarly-situated retirees, white police officers, in the same fashion as Plaintiff.

145.    As a direct consequence of the actions of the collective Defendants, Plaintiff was unreasonably denied his respective rights and is made to live in perpetual fear for his safety. Plaintiff was denied his right to property and right to care for his own well-being.

146.     Plaintiff has suffered monetary damages, special damages, legal fees, and unwarranted medical fees/costs, loss of time, loss of privileges and immunities due to the discriminatory actions of Defendants.

## AS AND FOR A FIRST COUNT
### *42 U.S.C. § 1981-* RACE AND COLOR DISCRIMINATION, HOSTILE WORK ENVIRONMENT AND RETALIATION

147.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 146 of this Complaint with the same force and effect as though fully set forth herein.

148.     The above discriminatory pattern and practice based on race, color, and national origin by Defendants COUNTY, NCPD, and KRUMPTER, through their agents and employees violates 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No, 102-406).

149.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, damage to his character and reputation.

150.     Plaintiff has been sorely mistreated and subjected to harassment, retaliation, and disparate treatment by Defendants COUNTY, NCPD, KRUMPTER, COMINSKEY, and MONK because of Plaintiff's race, color, national origin and fervent opposition to the discriminatory treatment he suffered, amongst other things.

151.     In essence, Plaintiff was treated differently than other similarly situated white police officers and/or workers in the NCPD, and this disparity was solely due to Mr. Kim's race, national origin and in retaliation for Plaintiff complaining about the discriminatory treatment.

152.    Defendants COUNTY, NCPD, KRUMPTER, COMINSKEY, and MONK, discriminated against Plaintiff by unjustifiably denying Plaintiff a "Good Guy letter" of good standing; a good faith determination as to disciplinary actions leveled against him; denying Plaintiff's right to carry fire arms as a retired police officer;  allowing  constant hostility and harassment to be perpetrated against Mr. Kim in the workplace; ignoring  Plaintiff's meritorious complaints about the harassment while he was employed as a Police  Officer in the NCPD; verbally abusing Plaintiff by calling Plaintiff derogatory and racist slurs; yelling at Plaintiff in the workplace; threatening Plaintiff with immediate termination with no benefits if he did not sign the agreement; and by allowing retaliatory actions to be taken against Plaintiff in the form of verbal, personal, and physical abuse, thereby subjecting Plaintiff to demeaning and differential treatment.

153.    All of these acts served to create a hostile working environment for Mr. Kim.

154.    Although Plaintiff complained of the discriminatory, hostile and disparate treatment to which he was subjected, Defendants, including COUNTY, NCPD, COMINSKEY, and KRUMPTER, sanctioned the mistreatment of Plaintiff by refraining from protecting Plaintiff from the aforementioned disparate treatment, and participating in Plaintiff's verbal abuse, denial of "Good Guy Letter", and subsequent termination under the guise of a "voluntary retirement."

155.    Defendants focused their actions on making the work environment toxic and non-welcoming to Mr. Kim.   He was subjected to repeated acts of abuse that caused him extreme distress while in the work place.

156.    Defendants violated public policy in discriminating against Plaintiff because of his race, color, and national origin amongst other things.

29

157.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of employment benefits, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to her reputation.

158.    Plaintiff was been subjected to a hostile work environment, abuse and mistreatment due to his race, color and national origin and has been treated differently than other white NCPD officers similarly situated.

159.    As a result of Defendants' acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of five- million dollars ($5,000,000.00) as well as punitive damages, costs and attorney's fees.

160.    As a result of the Defendants' acts, Plaintiff suffered and continues to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, sustained to date and continuing.

161.    As such, Plaintiff is entitled to damages in excess of the amount of Five Million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## AS AND FOR A SECOND COUNT
### *42 U.S.C.* § 1983 - EQUAL PROTECTION, DUE PROCESS
### 2nd and 14th AMENDMENT VIOLATIONS

162.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 161 of this Complaint with the same force and effect as though fully set forth herein.

163.     Plaintiff has a protected liberty and/or property interest in his firearms license, which has been taken away and/or denied without due process of law.

30

164.    Additionally, Plaintiff also had the protected right to be treated fairly in terms of disciplinary actions, a right which was taken away from him when he was wrongfully terminated and ultimately forced to retire.

165.    Defendant KRUMPTER'S unreasonable summary denial of Plaintiff's right to a "Good Guy Letter" and/or infringement upon Plaintiff's right to obtain a pistol permit and license to carry firearms post-retirement, due to his race, color and national origin, amounts to a summary denial of Plaintiff's right to equal protection of the laws following public employment, denial of due process of law as well as discriminatory and unequal treatment as a retiring Police Officer in good standing with County and NCPD.

166.    The discriminatory post-hoc  rule-making, selective enforcement, and summary denial by state actors, and policymakers such as Defendant KRUMPTER, violates the privileges and immunities section of the 14th Amendment, as well as Plaintiff's right to equal protection under the law, and his 2nd Amendment right to bear arms.

167.    Defendants have intentionally and invidiously discriminated and/or retaliated against Plaintiff with respect to Mr. Kim's former public employment and benefits of retirement because of his race, color, and national origin.

168.    COUNTY, NCPD, and Defendant KRUMPTER participated directly in violating Plaintiffs' constitutional rights and  as policymakers, were responsible for, and in charge of, the summary denial of Plaintiff's rights.

169.    Defendants' infringement upon and violation of Plaintiff's rights protected under the United States and New York State Constitution(s) were and is intended to place a chilling effect upon the exercise of such rights by Plaintiff, as well as to place a chilling effect on other officers of

a similar color, race, and national origin who intend to retire in good standing with County and NCPD.

170.    Unlawful discriminatory acts of Defendant KRUMPTER, who was the head decision-maker of the NCPD at the time of such denial, with the final say with regard to "Good Guy Letters", was part of the pattern, practice, policy, custom and usage of the Defendant COUNTY, and were reviewed by and adopted by Defendant COUNTY.

171.    This pattern, practice, policy, custom and usage is evident in the COUNTY'S use of the letter "Y" for yellow on internal records to identify Asian-American officers employed within the County, as reported by the New York Civil Liberties Union.

172.    By their actions, Defendants have intentionally deprived Plaintiff of valuable rights based on improper, unlawful and unconstitutional motives of denial of equal protection and refusal to adhere to Federal and State Law.

173.    All of Defendants' actions were taken under color of State law.

174.    Plaintiff who previously possessed, maintained, carried and owned firearms, had his rights revoked and/or indefinitely suspended contrary to his rights, existing law and the 2nd Amendment of the United States Constitution.

175.    Defendants by their actions have violated Plaintiff's rights to equal protection of the law as provided by the 2nd and 14th Amendments to the U.S. Constitution. Plaintiff has been treated differently from similarly-situated retirees who are not of Asian race and Korean ancestry and Plaintiff has been abused and violated because of those differences.

176.    Defendants have failed to conduct a proper due process hearing which is their obligation and responsibility to provide Plaintiff and to ensure "in a meaningful time and in a meaningful manner."

177.    As a direct consequence of the actions of the collective Defendants, Plaintiff was unreasonably denied his rights and caused to live in perpetual fear for his safety, as he was denied his right to property and right to care for his own well-being.

178.    Hence, Plaintiff suffered monetary damages, special damages, legal fees, and unwarranted medical fees/costs, loss of time, loss of privileges and immunities due to the discriminatory actions of Defendants.

179.    Individual Defendants have acted with malicious intent and/or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

180.    Defendant KRUMPTER acted intentionally and/or recklessly and with gross negligence to his duties and obligation to adhere to the law and to act free of discrimination. Defendant KRUMPTER also engaged in tortuous interference with prospective contractual advantages due to Plaintiff by acting to prevent Plaintiff from obtaining his license with the COUNTY.

181.    Defendants knew that they were violating the law, discriminating against and violating Plaintiff's rights and agreed with one another to so discriminate because of Plaintiff's race, color, and national origin.

182.    In so acting, Defendant KRUMPTER, through his agents and employees, took actions in violation of Plaintiff's rights which KRUMPTER knew or should have known were discriminatory and unequal in treatment.

183.    Defendant COUNTY acquiesced and contributed to the continuation of the agreement, pattern, practice, policy, custom and usage to violate Plaintiff's rights in failing to take action as to prevent and expose the ongoing discriminatory and violative actions being taken against Plaintiffs.

184.    Defendant KRUMPTER was motivated by improper interests with respect to his efforts to discriminate against Plaintiff. Collectively, the individual Defendants' actions were contrary to the Defendant COUNTY'S stated Equal Employment Opportunity and anti-discrimination policies.

185.    As a direct and proximate result of said acts, Plaintiff suffered and continues to suffer loss of benefits, loss of opportunities, loss of privileges, deprivation of constitutional rights, fear for personal safety, distress, humiliation, expense and embarrassment.

186.    Plaintiff is entitled to a declaratory judgment against Defendants in addition to an Order enjoining Defendants from continuing to engage in the discriminatory acts outlined above. Plaintiff suffered and is entitled to, a declaratory judgment correcting the wrongs and violations committed and damages sustained to date and continuing in excess of five million dollars ($5,000,000), as well as punitive damages, costs and attorney's fees.

## AS AND FOR A THIRD COUNT
### *42 U.S.C. § 1983* - MUNICIPAL LIABILITY
### AGAINST THE COUNTY OF NASSAU

187.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 186 of this Complaint with the same force and effect as though fully set forth herein.

188.    At all times relevant to the Complaint, Defendant KRUMPTER was the policymaker for the NASSAU COUNTY POLICE DEPARTMENT because Defendant KRUMPTER was the then Acting Police Commissioner, and thus, the highest ranking member, manager, supervisor and controller of same.

189.    Policymaker KRUMPTER was directly involved in the violations of Plaintiff's rights herein.

190.    Unlawful discriminatory acts by Defendant KRUMPTER, who was the head of the NASSAU COUNTY POLICE DEPARTMENT, with the final say with regard to "Good Guy Letters", were part of the policy and/or custom of the Defendant COUNTY, and were reviewed by and adopted by the Defendant COUNTY.

191.    By their actions, Defendants have intentionally deprived Plaintiff of valuable rights based on unlawful and unconstitutional motives of denial of equal protection, and refusal to adhere to federal and State Law.

192.    All of the Collective Defendants' actions were taken under color of State law.

193.    In addition**,** by actively inflicting and failing to prevent the above stated abuse incurred by Plaintiff, the Defendant COUNTY and NCPD acted unreasonably, recklessly, and negligently in failing to exercise the slightest amount of due care to secure and protect the civil and constitutional rights of the Plaintiffs.

194.     The COUNTY OF NASSAU has permitted, tolerated and encouraged the unjustified, unreasonable denial of a "Good Guy Letter" to Plaintiff, Mr. Kim, who sought one when he was terminated and forced to retire on the basis of his race, color, and national origin.

195.    Although such conduct was improper, said incidents were supported by the COUNTY, its agents, employees and servants, such as Defendant KRUMPTER.

196.    Said discriminatory acts by KRUMPTER have been fully backed by the COUNTY OF NASSAU, which has repeatedly and  unreasonably sided with the abuse of persons so affected in nearly all cases, despite vast evidence of wrongdoing by its agents, employees, and servants at the NCPD against individuals of a different race, color, and national origin than the majority white population at the NCPD, including Plaintiff herein.

197.   Additionally, the COUNTY OF NASSAU has systematically failed to identify the improper abuse, misuse, violative acts by its Former Police Commissioner KRUMPTER and officials, while further failing to subject such officers and officials to discipline, closer supervision, training, instruction, or restraint.

198.   By permitting and assisting such a pattern of misconduct, the Defendant COUNTY OF NASSAU acted under color of custom and policy to condone, encourage and promote the deprivation of Plaintiff's Second (2nd)  and Fourteenth (14th) Amendment rights; to wit, the Defendants NASSAU COUNTY POLICE DEPARTMENT AND KRUMPTER  were encouraged by the COUNTY OF NASSAU to believe that their actions against the Plaintiff would be accepted without question, just as these actions have been so accepted to date.

199.   As a consequence of the Defendant's COUNTY systemic practice, pattern, and custom of intentionally promoting and supporting the NCPD and/or KRUMPTER'S violations of *42 U.S.C.* § 1983, Plaintiffs suffered and continue to suffer loss of benefits, loss of privileges, loss/deprivation of constitutional rights, fear for personal safety, distress, humiliation, expense, and embarrassment.

200.   Plaintiff is entitled to a declaratory judgment against Defendants in addition to an Order enjoining Defendants from continuing to engage in the discriminatory acts outlined above. Plaintiff suffered and is entitled to, a declaratory judgment correcting the wrongs and violations committed and  damages sustained to date and continuing, in excess of five million  dollars ($5,000,000), as well as punitive damages, costs and attorney 's fees.

## AS AND FOR A FOURTH COUNT
### *42 U.S.C.* § 1983 - MONELL CLAIM FOR NEGLIGENT SUPERVISION, FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE AGAINST COUNTY OF NASSAU

201.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 200 of this Complaint with the same force and effect as though fully set forth herein.

202.   Defendant COUNTY, by and through their policymakers, created and maintained respective customs, policies and/or practices of negligently supervising, failing to adequately train, supervise and discipline their employees and agents, including the named Defendant KRUMPTER as well as police officers, agents, employees, and servants under their supervision and control in this case, regarding civilians' right to equal protection, and civilians' right to be free from discrimination and retaliation based on race, color, and/or national origin.

203.   Defendant COUNTY voluntarily assumed a duty to protect Plaintiff from the continued harassment and discrimination of Defendant KRUMPTER when County hired Plaintiff as a Police Officer at the NCPD Fifth (5th) Precinct. As such, Plaintiff justifiably relied on that duty and expected such protection from unequal and harassing treatment.

204.   Defendant COUNTY had actual or constructive notice of their negligent supervision, and failures to train, supervise and discipline their employees. This is because Defendants knew that it was foreseeable that their employees would confront situations requiring knowledge of individuals' Civil Rights, and association rights, discrimination based on national origin, race, color, etc., and that without the necessary training, supervision and discipline, constitutional violations would result. Yet Defendant COUNTY chose not to provide such training, supervision and discipline.

205.    Defendant COUNTY'S negligent supervision, failure to train, supervise and discipline amounted to gross negligence, deliberate indifference and/or intentional misconduct, and encouraged and/or permitted the named and unnamed individual Defendants to engage in the conduct which proximately and directly caused Plaintiff's injuries and damages set forth above.

206.    As a result of Defendants unlawful acts, Plaintiff is entitled to the maximum monetary damages and penalties available by law, as well as costs, attorney's fees and punitive damages, together in excess of five million dollars ($5,000,000).

### AS AND FOR A FIFTH COUNT
### *42 U.S.C.* § 1983 - MUNICIPAL LIABILITY
### FOR DISCRIMINATION AND RETALIATION
### AGAINST COUNTY OF NASSAU

207.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 206 of this Complaint with the same force and effect as though fully set forth herein.

208.    Prior to Plaintiff's wrongful termination on April 16, 2017 and since, Defendant COUNTY has permitted a pattern of unjustifiable, unreasonable, and unequal treatment of minority classes who are employed at the NASSAU COUNTY POLICE DEPARTMENT.

209.    Such pattern of mistreatment and discrimination has caused violence to be taken against minority classes at NCPD, and retaliatory conduct either verbal, professional, or physical to be taken against minorities.  Allowing for the proliferation of wrongful terminations, denial of Letters of Good Standing, and the inhuman treatment of other fellow officers who are employed at NCPD and who are of a minority class.

210.    Although such abusive conduct is improper and illegal, the officials, officers, agents, and employees of COUNTY working at the NCPD were not and are not being seriously prosecuted,

disciplined, or subjected to restraint.  The reaction of COUNTY in response to such discrimination and retaliatory conduct of its employees at the NCPD were in fact attempts to cover up such abuses with official claims, reports, and investigations that claim such incidents never occurred.

211.    As a result, Defendant KRUMPTER, and the police officers who have retaliated and/or discriminated against Plaintiff, were caused and encouraged to believe that fellow officers of a minority class can be abused, bullied, harassed, physically assaulted, retaliated against, and that such abuses would be permitted by COUNTY.

212.    Examples of this fact of discrimination, retaliation, and disparate treatment of minority officers that have been condoned by COUNTY to continue at NCPD, include, but are not limited to:

- All Asian American Police Officers of NCPD who have been categorized by NCPD with the letter "Y" for yellow, as reported by the New York Civil Liberties Union;

- James M. Quinn, *Quinn v. Nassau County Police Dept.*, 53 F. Supp. 2d 347, 350 (E.D.N.Y. 1999);

- Barbara Friel, *Friel v. County of Nassau, et al,* 947 F.Supp.2d 239;

- Clifford Johnson, *Johnson v. County of Nassau,* 480 F.Supp.2d 581;

- Matthew Prince, *Prince v. County of Nassau, et al, 837 F.Supp.2d 71;*

- Maryellen Humphrey, *Humphrey v. County of Nassau,* 2009 WL 875534 United States District Court, E.D. New York*,* 2:06-CV-03682;

- Rodney Johnson, *Johnson v. County of Nassau,* 82 F.Supp.3d 533;

- Natalie Beyer, *Beyer v. County of Nassau,* 524 F.3d 160;

- Denis J. Monette, *Monette v. County of Nassau,* 2016 WL 4145798; and

- The Plaintiff in this instant Complaint, Sung D. Kim.

213.    In addition to permitting a pattern and practice of discrimination and retaliation in the NCPD work place amongst fellow officers and supervisors, COUNTY has also failed to properly investigate such matters of disparate treatment of minority officers by fellow officers, supervisors, and officials.

214.    The EEO Complaints by individuals who have been discriminated, harassed, and retaliated against have been ignored and not taken seriously by the EEO Officers at NCPD. The COUNTY has failed to respond to the continuing and urgent need to prevent, restrain, and discipline officials in supervisory positions or positions of authority who wrongfully terminate, discriminate, harass, and retaliate against employees' of minority classes.

215.    The County has also failed to find that employee complaints made to the EEO against supervisors and/or employees in a position of authority over the complainants are founded or valid in anyway.

216.    The COUNTY is therefore liable under 42 U.S.C. §1983 because the COUNTY has had actual and/or constructive knowledge of the patterns of abuse, discrimination, harassment, and retaliation of its police officers, employees, and/or agents by supervisors, and individuals in authority in violation of the United State Constitution.

217.    Because of the County, and the NASSAU COUNTY POLICE DEPARTMENT'S un-meaningful policy and custom for reviewing complaints of misconduct, Defendant KRUMPTER and NCPD relied upon that flawed policy to continue the patterns of their abusive authority, discrimination, retaliation, and harassment, all in violation of the Plaintiff's rights.

218.    As a consequence of Defendants' wrongful actions, intentional, negligent, and reckless behavior, and violations of state and federal laws, Plaintiff was deprived of his freedom, was

made to suffer physical injuries, great pain and suffering, and was subjected to great fear and terror, personal humiliation, degradation, and continued to suffer physical pain and mental and emotional distress as a result of the aforesaid unlawful conduct of the Defendants.

219.    As a direct result of said acts, Plaintiff has suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to his reputation, and the emotional and psychological trauma as alleged in the preceding paragraphs of the within complaint.

220.    That by reason of the foregoing, Plaintiff has been exposed to disgrace, public humiliation and embarrassment and has been damaged in sum in excess of five million dollars ($5,000,000.00), including the cost of this action, attorneys fees pursuant 42 U.S.C. §1988, and punitive damages.

## AS AND FOR A SIXTH COUNT
## VIOLATION OF N.Y. EXECUTIVE LAW, ARTICLE 15

221.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 220 of this Complaint with the same force and effect as though fully set forth herein.

222.    The above-captioned Defendants, by way of terminating Plaintiff and forcing Plaintiff to retire, and failure of Defendants, and their administration to properly investigate EEO complaints which allege race based discrimination, failure to issue Plaintiff a letter of good standing, their discriminatory treatment of Plaintiff on the basis of his race, color, national origin and opposition to discrimination, and their intentional creation of unequal terms and conditions, denied Plaintiff the rights to equal protection of the local, state and federal laws.

223.    By the Defendants' acts asset forth in the Factual Allegations above, Plaintiff was subjected to discriminatory treatment, and retaliation, based on race, color, and national origin. Said acts violate the New York State Human Rights Law (Executive Law § 296).

224.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of employment benefits, loss of career opportunities, and has suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to her reputation, and the emotional and psychological trauma as alleged in the preceding paragraphs of the within complaint.

225.    As a result of Defendants' unlawful acts, Plaintiff is entitled to the maximum monetary damages and penalties available by law, as well as costs, attorney's fees and punitive damages, together in excess of five million dollars ($5,000,000).

## AS AND FOR A SEVENTH COUNT
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

226.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 225 of this Complaint with the same force and effect as though fully set forth herein.

227.    The Defendants COUNTY, NCPD, and KRUMPTER, through their conduct, acts and omissions as set forth in the above pleaded allegations, acted outrageously and beyond the bounds of decency, for their above-stated, respective roles in the discrimination and retaliation against Plaintiff including but not limited to the failure to redress the wrongs done to Plaintiff Sung D. Kim.

228.    The Defendants COUNTY, NCPD, and KRUMPTER, committed the above stated reprehensible, extreme and outrageous conduct against Plaintiff Sung D. Kim, with full knowledge

42

that their conduct would cause severe and extreme emotional harm to Sung D. Kim, and to her close family members, and with such extreme emotional harm being intended.

229.    Said extreme emotional harm, with psychological and physical symptoms manifesting therefrom, did in fact occur in this case, in that the Plaintiff was debilitated, terrified, humiliated, and caused to suffer anxiety and anguish, by the Defendants' discriminatory acts committed against her.

230.    As a direct result of said acts, Plaintiff has suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to his reputation, and the emotional and psychological trauma as alleged in the preceding paragraphs of the within complaint.

231.    That by reason of the foregoing, Plaintiff has been exposed to disgrace, public humiliation and embarrassment and has been damaged in sum in excess of five million dollars ($5,000,000.00), including the cost of this action, attorneys fees pursuant 42 U.S.C. §1988, and punitive damages.

## AS AND FOR AN EIGHTH COUNT
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

232.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 231 of this Complaint with the same force and effect as though fully set forth herein.

233.    The Defendants COUNTY, NCPD, and KRUMPTER, through their conduct, acts and omissions as set forth in the above pleaded allegations, acted negligently, outrageously and beyond the bounds of decency, for their above-stated, respective roles in the discrimination and retaliation

43

against Plaintiff including but not limited to the failure to redress the wrongs done to Plaintiff Sung D. Kim.

234. When the Defendants COUNTY, NCPD, and KRUMPTER, committed the above stated reprehensible, extreme and outrageous conduct against Plaintiff Sung D. Kim, they knew and/or should have known that their conduct would cause severe and extreme emotional harm to Mr. Kim, and to his close family members, and with such extreme emotional harm being intended.

235. Said extreme emotional harm, with psychological and physical symptoms manifesting therefrom, did in fact occur in this case, in that the Plaintiff was debilitated, terrified, humiliated, and caused to suffer anxiety and anguish, by the Defendants' discriminatory acts committed against her.

236. As a direct result of said acts, Plaintiff has suffered and continues to suffer repeated, severe and permanent psychological, emotional and physical trauma and damage, including distress, humiliation, embarrassment, great financial expense and damage to his reputation, and the emotional and psychological trauma as alleged in the preceding paragraphs of the within complaint.

237. That by reason of the foregoing, Plaintiff has been exposed to disgrace, public humiliation and embarrassment and has been damaged in sum in excess of five million dollars ($5,000,000.00), including the cost of this action, attorneys fees pursuant 42 U.S.C. §1988, and punitive damages.

**WHEREFORE** Plaintiff demands judgment against Defendants as follows:

a.      First Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.      Second Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.      Third Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.      Fourth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.      Fifth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.      Sixth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

g.      Seventh Count: in excess of five million ($5,000,000.00) dollars as well punitive damages, costs and attorney's fees.

h.      Eight Count: in excess of five million ($5,000,000.00) dollars as well punitive damages, costs and attorney's fees.

I.      Punitive damages in the amount of TEN MILLION ($10,000,000) DOLLARS.

j.      Award attorney's fees and costs of this action to the Plaintiffs pursuant to 42 U.S.C. § 1988;

k.      Declaratory Judgment that defendants wilfully violated Plaintiffs' rights secured by federal and state law as alleged herein;

l.      Injunctive relief, requiring defendants to correct all past violations of federal and state law as alleged herein; to enjoin defendants from continuing to violate federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

m.      Award such other and further relief as this Court may deem appropriate

### ***A JURY TRIAL IS HEREBY DEMANDED***

Dated: Hempstead, New York
     May 30, 2019

                                     Respectfully submitted,

                                     THE LAW OFFICES OF
                                     FREDERICK K. BREWINGTON

By:     ***/S/: Frederick K. Brewington***
                                     FREDERICK K. BREWINGTON
                                     *Attorneys for Plaintiff*
                                     556 Peninsula Boulevard
                                     Hempstead, New York 11550
                                     (516) 489-6959