**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SUNG D. KIM,

                             Plaintiff,                              **REPORT AND**
                                                               **RECOMMENDATION**
           -against-                                      CV 19-3264 (SJF) (ARL)

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, THOMAS KRUMPTER
*Former Acting Police Commissioner, in his individual*
*and official capacity,* SERGEANT TARA COMINSKEY
and POLICE OFFICER BRIAN MONK,

                             Defendants.
-----------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

On May 31, 2019, the plaintiff, Sung D. Kim ("Kim"), commenced this action against the defendants, the County of Nassau (the "County"), the Nassau County Police Department ("NCPD"), the former acting Police Commissioner Thomas Krumpter, ("Krumpter"), Sergeant Tara Cominskey ("Cominskey") and Police Officer Brian Monk ("Monk") (collectively, the "defendants"), pursuant to 42 U.S.C. §§ 1981, 1983 and 1988, the Second and Fourteenth Amendments to the United States Constitution, and New York State Executive Law §§ 290 and 296, alleging that he was discriminated against by the defendants due to his Asian American race and South Korean national origin. Kim seeks damages for the alleged retaliatory employment practices of the defendants, his forced resignation, the hostile work environment to which he was exposed and the violation of his right to bear arms. Before the Court, on referral from District Judge Feuerstein, is the motion of the defendants to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the undersigned respectfully recommends that the motion be granted.

# BACKGROUND

## A.     Factual Averments

The following facts are drawn from the Complaint and are accepted as true for purposes of the instant motion. *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). These facts, however, do not constitute findings of fact by the Court. *See Colvin v. State University College at Farmingdale*, No. 13-CV-3595 (SJF) (ARL), 2014 U.S. Dist. LEXIS 85678, 2014 WL 2864224, at *1, n.1 (E.D.N.Y. June 19, 2014).[1]

### 1.     The Parties

Kim is an Asian American man of South Korean descent, who worked as a police officer for the NCPD between March 11, 2005 and April 16, 2017. Compl. ¶¶ 15, 18. Prior to his employment at the NCPD, Kim worked for eight years as a police officer for the New York City Police Department. *Id.* ¶ 16. The defendant County is a municipal corporation of the State of New York with direct authority over the NCPD. *Id.* ¶ 10. The defendant Krumpter is the former Acting Police Commissioner of the NCPD. *Id.* ¶ 12. He served as the Police Commissioner at all times relevant to this complaint. *Id.* The defendant Cominskey was a police officer and the Equal Employment Officer employed by the County. *Id.* ¶ 13. The defendant Monk was also a police officer at the NCPD. *Id.* ¶ 14.

### 2.     The Events Leading up to Kim's Termination

On November 25, 2012, Kim was working overtime as signal monitor. *Id.* ¶ 28. At some point, Kim heard the voices of other police officers congregating in a nearby room and walked to the doorway of that room to see what was happening. *Id.* ¶ 29. Kim noticed Monk standing near the doorway at the other end of the room but returned to his desk to answer the phone without

---

[1] Kim has not offered a statement of facts in his memorandum in opposition to the defendants' motion. Rather, he refers the Court to the entirety of the complaint. Pl.'s Mem. at 3.

engaging Monk. *Id.* According to the complaint, a few minutes later, Kim was knocked off his chair and thrown to the floor. *Id.* ¶ 30. Kim claims that he was hit from the right side as if tackled and fell to the ground hitting the back of his head and hands on the floor. *Id.* When Kim regained his senses, he realized that Monk was on top of him. *Id.* ¶ 31.

Monk continued to punch Kim and Kim attempted to block the punches by holding one of Monk's arms. *Id.* ¶ 32. Kim then tried to grab hold of Monk's vest. *Id.* Eventually Monk was pulled off of Kim by Police Officer Casella ("Casella"). *Id.* ¶ 33. Casella then helped Kim up off the floor. *Id.* Although Casella, with the help of Police Officer Trosko ("Trosko"), kept Monk and Kim separated, Monk continued to yell "this is payback." *Id.* ¶ 34. Upset by the attack, Kim responded "you're not a man, you're a pussy, and if you have a problem with me, let's take it outside." *Id.*

Following the incident, Casella took Monk into the hallway because he refused to calm down. *Id.* Kim, who was feeling anxious and dazed, began to pace and in doing so tripped over a step leading back to his desk. *Id.* ¶ 35. As he fell, he hit his hand on the side of a metal desk. *Id.* When he stood up, one of the officers noticed that his hand looked swollen. *Id.* ¶ 35. An ambulance was called and Kim was taken to the hospital. *Id.* ¶ 36. The ambulance was driven by Police Officer Volpe ("Volpe") while an Ambulance Medical Technician remained in the back with Kim. *Id.* Kim was taken to Franklin General Hospital where it was later determined that his hand was broken. *Id.* ¶¶ 36-7. Kim's hand was placed in a cast and he was given pain killers and released several hours later. *Id.* ¶ 38.

Upon his release from the hospital, Kim was driven back to the station house and was told to report to his supervisor's office. *Id.* ¶ 39. An injury report was prepared by the supervisor and a member injury statement was prepared by Volpe. *Id.* The injury was reported

as a line of duty injury and Kim was awarded worker's compensation. *Id.*

### 3. Kim's Request for a Squad Change

In February 2013, when Kim returned to work, Kim was placed on restricted assignment with the same squad to which he had been assigned prior to the November 2012 incident. *Id.* ¶ 46. He remained with that squad for seven months, but in September 2013, Kim requested a squad change. *Id.* Kim explained that for eight years, he had been enduring racially motivated incidents at the Fifth Precinct. *Id.* ¶ 47. Cominskey, the Equal Employment Officer, dismissed his complaints, indicating that they were not severe or pervasive. *Id.* ¶ 50. She also told Kim that "he "should try writing more summonses if . . . [wanted] a transfer." *Id.* Kim notes that he had reported a number of incidents to Cominskey and she did not take his allegations seriously. *Id.* ¶ 48. Kim further claims that Cominskey's failure to present his complaints to the director was contrary to EEO policies and procedures. *Id.*

### 4. Kim's Disciplinary Hearing and Termination

Nevertheless, Kim remained with the squad and, in June 2015, over two years after the incident with Monk, Kim was subjected to a disciplinary **h**earing. *Id.* ¶¶ 51-2. Kim claims that the focus of the hearing was how the injury to his hand had occurred. *Id.* He further asserts that he was forced to defend himself against accusations regarding the physical attack by Monk. *Id.* At the conclusion of the hearing, the hearing officer recommended a four month suspension for both Monk and Kim. *Id.* ¶ 52. Kim felt the decision was completely unwarranted since he had been attacked and harassed by a fellow officer who disliked him because of his Asian American race and South Korean origin. *Id.* ¶ 53. Kim believes that had any non-Asian-American officer been unjustifiably attacked and harassed by a fellow officer, that officer would not have been disciplined. *Id.* ¶ 54.

Kim further complains that when Krumpter received the hearing officer's recommendation to suspend him for four months, Krumpter chose to disregard it.[2]  *Id.* ¶ 55. Instead, Krumpter decided to terminate Kim.  Defs. Mem. at 4.  However, after meeting with Kim's counsel's and a representative from the Police Benevolent Association, Kim was given the option to sign a Stipulation of Settlement and Release (the "Release") permitting him to remain employed until April 16, 2017.  *Id.* ¶¶ 55-6.  Kim claims that Krumpter told him that if he wanted to remain on the force to complete his twenty year requirement and receive full pension benefits, he had to sign the Release.  *Id.* ¶ 57.  At the time, Kim also spoke to his union representative and was advised that if he did not sign the document, he would be terminated immediately and lose his twenty years of service.  *Id.* ¶ 58.

On December 23, 2016, Kim executed the Release, which stated, in pertinent part:

> Police Officer Kim acknowledges that he has been fairly represented throughout this process by counsel, and his union, the Police Benevolent Association, and releases counsel and the union from any and all liability arising from this proceeding.  Police Officer Kim acknowledges that he has been given the opportunity to consult with counsel and his Union prior to executing this Settlement Agreement and Release.  Police Officer Kim further acknowledges that he has carefully read this Settlement Agreement and Release in its entirety, understands the terms of this Settlement Agreement and Release, voluntarily assents to all terms, conditions and obligations contained herein; and is signing this Settlement Agreement and Release voluntarily and of his own free will.

> \*          \*          \*

> Police Office Kim will not receive any termination pay, pay for unused sick time, or compensation for any other time that he may have been entitled to except pay for any deferred and/or lagged monies.

> \*          \*          \*

> In exchange for the consideration set forth in this Settlement Agreement, Police Officer Kim, . . . hereby releases and forever discharges Nassau County and its

---

[2] Monk, who is a white officer, was given the recommended four month suspension and then transferred to Police Headquarters.  *Id.* ¶ 60.

> officers, employees and assigns, . . . of and from all manners of actions, proceedings, causes of action, . . . arising our of any federal, state or city constitution, statute, ordinance, by-law or regulations . . ..

*See* Rogers Decl., Ex. B. Kim insists that he signed the Release under extreme duress. *Id.* ¶ 59.

> **5.** **Other Incidents Reflecting the Defendants' Alleged Racial Disdain**

In the complaint, Kim also alleges that after he was attacked in November 2012, he realized the depth of Monk's racial disdain. *Id.* ¶ 41. To this end, Kim asserts that he began to recall numerous incidents in which Monk and others humiliated him in front of the entire police precinct. *Id.* For example, on December 10, 2010, Kim was asked to leave his post to attend to a matter that required Kim to guard a perimeter in search of a suspect. *Id.* ¶ 100. When Kim's services were no longer needed, he returned to the precinct to drop off some paperwork for a burglary that took place earlier in the day. *Id.* As Kim was exiting the building, Police Officer Catrina Rhatigan ("Rhatigan") came into the lobby with her partner, John Wellenreuther, and a detainee. *Id.* ¶ 101. When Rhatigan was close to Kim, Rhatigan yelled "Oh, and by the way this was your fucking post, you fucking pale!" *Id.* Kim responded to the comment and a verbal altercation ensued. *Id.* ¶ 102. Although Rhatigan had initially engaged Kim, the on-duty supervisor, Sgt. Joseph Miller ("Miller"), rushed across the lobby, jabbed his fingers into Kim's chest and stated, "Shut the fuck up!" *Id.* ¶ 103. Following the incident, Miller told Kim that he would not apologize but had regretted that Kim received the brunt of his actions. *Id.*

In addition, on several occasions between 2011 and 2012, pictures of the former North Korean dictator were posted around the precinct with Kim's name written underneath. *Id.* ¶ 84. Kim complained about the pictures but they remained posted until Kim removed them. *Id.* When a new Korean dictator took office, similar pictures were posted with a caption "Kim Jong-un's brother." *Id.* The pictures of the new Korean dictator were posted on a billboard in a

meeting room where all the police officers and supervisors could see them, but no one reported the posting of the pictures despite their obligation to report offensive material pursuant to NCPD policy. *Id.* ¶ 85.

Similarly, prior to the 2012 incident, pictures of Long Duck Dong, a character from the movie Sixteen Candles, were also posted around the station house. *Id.* ¶ 42. Kim was highly offended by the posting since Long Duck Dong displayed racial stereotypes of Asian people and was often used as a means to mock and ridicule people of Asian descent. *Id.* Monk admitted hanging up the Long Duck Dong pictures and, at the time, Kim requested a transfer fearing that there would be a confrontation between him and Monk at some point. *Id.* ¶¶ 43-4.

At other times, there were false anonymous 911 calls made about "a suspicious looking Asian man in uniform in a dumpster." *Id.* ¶ 99. Kim claims the calls were about him. *Id.* Kim also recalls that in the latter part of June 2012, he was working the night tour and responded to a call about a larceny. *Id.* ¶ 77. Kim took the report and then called "Case Offense" to file the case report. *Id.* ¶ 78. While he was still on hold, Kim received a message from another officer, Glenn Santoro ("Santoro"), who said there was a "mental aided call on [his] post." *Id.* The message Kim received stated "you're a pale and you're trying to scam by holding on the call." *Id.* In response, Kim told Santoro that he was attempting to call in a report. *Id.* Despite his explanation, Santoro continued to deride Kim with derogatory comments. *Id.* Kim believes that ultimately Santoro's partner, Salvatore Maiello, told Santoro to stop sending Kim messages. *Id.* ¶ 79.

On another occasion during that same month, Kim applied to the Recruitment Section for the Nassau County Police Exam. *Id.* ¶ 80. Kim was the only Asian officer to request the assignment. *Id,* Kim felt his Korean background and law enforcement experience would be an

asset to the Recruitment Section. *Id.* However, he was passed over and not even considered for the position. *Id.* Kim was surprised that he was denied the opportunity to join the Recruitment Section because he could have recruited within the Asian Community. *Id.* ¶ 81. Kim believes that he was not considered for the position because his Commanding Officer wrote him a poor recommendation in retaliation for the multiple EEO complaints he had filed. *Id.* ¶¶ 82-3.

Kim also claims that, in or around June 2013, someone wrote "very stupid" on the front of his assignment folder. *Id.* ¶ 86. Kim believes the comment had to be written by a fellow officer because of where his folder was kept in the precinct. *Id.* At the time, Kim responded by writing the word "coward" on his own folder. *Id.* When Kim checked his folder a few days later, the folder was missing. *Id.* Kim notified his supervisor, Sgt. Tim Rooney ("Rooney"), that his folder had been taken with work related documents inside. *Id.* Rooney notified Commission Officer Psoinas and Cominskey, who scheduled an interview with Kim to take place at the EEO office. *Id.* In the meantime, Kim was given a new folder. *Id.* ¶ 87. When Kim checked his new folder a few days later, the words "I'm a victim lol" was written on the front cover. *Id.* Kim, once again, notified Rooney, who instructed Kim to bring the new folder to his EEO interview. *Id.* ¶ 88. Kim's folder was replaced for a second time, but about four months later, the folder went missing again. *Id.* ¶ 89. Kim reported the incident to the appropriate sergeants, as well as to Rooney and Cominskey. *Id.*

Moreover, Kim alleges that a series of incidents occurred during a particular shift sometime in September 2013. *Id.* ¶ 90. Specifically, on that evening, Kim was working at the Policing Center on restricted duty. *Id.* ¶ 91. He recalls that it was particularly busy and he was assisting a fellow officer, Karen Crose ("Crose"), with the signal monitor. *Id.* Kim was sitting in room thirty-two when a complainant walked in and wanted to file a harassment report. *Id.*

Kim advised Crose that there was a complainant who needed assistance. *Id.* In response, Crose raised her voice, used profanity and told Kim that it was "inappropriate" of him to tell her about the complainant. *Id.*

The second incident, which occurred that night, also happened while Kim was sitting in room thirty-two. *Id.* ¶ 92. According to Kim, the room was completely full of officers and there were no seats available. *Id.* When Crose entered the room, she said "get the fuck out of my seat" to Kim. *Id.* Kim says he was very embarrassed and upset, but he did not want to escalate the situation. *Id.*

The third incident that evening involved a large garbage pail that Crose carried into room thirty-two. *Id.* ¶ 93. When she arrived, Crose stated to Kim, in the presence of his fellow officers, "it's your fucking turn to clean out the garbage!" *Id.* Kim claims he was humiliated, very upset and made to feel like less of a person at that time. *Id.* ¶ 94. Again, Kim asserts that he did not want to escalate the matter and chose to follow proper protocol even though he was upset. *Id.* Kim did not immediately report the incident because he was fearful of retaliation. *Id.* However, Kim ultimately informed his union representative, Dean Losquandero ("Losquandero"), of the incidents and requested a squad change. *Id.* ¶ 95. Losquandero and Cominskey informed Krumpter that Kim had launched complaints against his fellow officers and requested a transfer. *Id.* ¶ 96. Losquandero then met with Krumpter and asked him to grant Kim's transfer request. *Id.* Krumpter allegedly replied "Why should I help him?" "He's a Gook and a malingerer." *Id.*

Finally, Kim recalls that on another unspecified evening, Police Officer George Theodoropoulos ("Theodoropoulos") was watching You Tube videos about the Asiana Airline plane crash, ridiculing the names of the Asiana Airline pilots. *Id.* ¶ 97. Theodoropoulos

repeatedly played the video showing it to other officers and laughing.  *Id.*  When Kim saw the video, he spoke to Theodoropoulos privately and told him that video was racially offensive and inappropriate.  *Id.* ¶ 98.  Theodoropoulos defended the video by stating that it was not racist.  *Id.*  Nevertheless, Theodoropoulos apologized later that day.  *Id.*

**6.    Additional Incidents Following the Signing of the Agreement and Kim's Mental State**

On April 10, 2017, seven days before his termination date, Kim was told by Police Officer Judge that there was a phone call for him.  *Id.* ¶ 105.  Kim picked up the extension and an unknown male caller mocked him in an Asian accent stating, "ha ha ha, you won't have a job. You'll be delivering egg rolls, Gook. Ha ha ha." *Id.*  The caller hung up abruptly.  *Id.*  Kim did not recognize the voice but did report the incident to the new EEO Officer, Nathalie Bell ("Bell"), who opened an official investigation.  *Id.* ¶ 106.  Bell had worked with Cominskey in the Legal Bureau and, according to Bell's husband, Jonathan Bell, Esq, Bell and Cominskey were good friends.  *Id.*  According to Kim, Bell did not follow through with the investigation. *Id.*

**7.    The Good Guy Letter and the Denial of Termination Pay**

Kim also alleges that Krumpter's harassment and discriminatory treatment continued after he signed the Stipulation and Release.  Specifically, Krumpter refused to issue Kim a Letter of Good Standing known as "Good Guy Letter." *Id.* ¶ 62.  Good Guy Letters are typically given to officers upon retirement, who are in good standing and free from any mental disabilities or any illness which would prevent the officer from properly securing or operating a firearm.  *Id.* ¶ 64.  Because Kim was not given a Good Guy Letter, upon his retirement, Kim claims that could not apply for a pistol permit or possess and carry a pistol as a retiree.  *Id.* ¶ 63.  Kim believes that the only reason he was denied a Good Guy Letter is because he is Asian and South Korean and

because he filed complaints pursuant to EEO policies and procedures about the harassment and discriminatory treatment by all of the defendants. *Id.* ¶ 65. Kim further asserts that he did not have any mental disability or illness which would have prevented him from properly operating and/or securing a firearm, and he was an officer in good standing at all times relevant to this complaint. *Id.* ¶¶ 70-1.

Kim also applied for a job as a Public Safety Officer and was denied the position, due to the revocation of his NYS Certification and lack of a "Good Guy Letter." *Id.* ¶ 117.

### 8. Kim's Alleged Damages

According to the complaint, as a result of the discriminatory and retaliatory behavior of the defendants, Kim has suffered from extreme stress, anxiety and fear. *Id.* ¶ 112. He claims that his work environment had become a source of hostility and a trigger for anxiety and mental anguish. *Id.* Kim has sought out professional help to cope with this situation and has been diagnosed with PTSD, depression and anxiety. *Id.* ¶ 113. Kim also asserts that as a direct consequence of the defendants' actions, he was unreasonably denied the right to carry a concealed weapon and is now made to live in perpetual fear for his safety. *Id.* ¶¶ 119-46. Finally, Kim claims he was denied termination pay, pay for his unused sick and vacation time, and was restricted to the use of only ten sick days between the time he signed the agreement on December 23, 2016, and the date of his termination on April 17, 2017. *Id.* ¶ 72.

### B. Procedural History

On May 1, 2017, Kim filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging claims of discrimination, hostile work environment and retaliation against the County and the NCPD. Rogers Decl., Ex. C. On September 6, 2017, Kim, who was represented by counsel, filed an amended complaint with the NYSDHR alleging

claims similarly to those asserted in the instant case, including discrimination, hostile work environment and retaliation in violation of the Executive Law §§ 290 and 296 and Title VII of the Civil Rights Act. *Id.* Ex. D. Kim also complained that he was not given a Good Guy Letter and was limited to the use of ten sick days between the time he signed the agreement and the date of termination. *Id.* On November 7, 2017, the NYSDHR determined that Kim had released all of his potential claims prior to his execution of Release, and thus, issued a no probable cause determination. *Id.* Ex. E. Indeed, the NYSDHR determined that the only remaining allegation concerned the April 10, 2017 phone call that was properly investigated by the NCPD. *Id.*

Nonetheless, as stated above, eighteen months later, Kim filed the instant action asserting claims under 42 U.S.C. §§ 1981, 1983 and 1988, the Second and Fourteenth Amendments to the United States Constitution, New York State Human Rights Executive Law §§ 290 and 296, as well as two state law claims. On November 26, 2019, the defendants filed the instant motion, arguing that the complaint constitutes an improper attempt to litigate claims that Kim previously waived by virtue of the Settlement and Release document. The defendants also contend that Kim is collaterally estopped from raising the claims given the NYSDHR's decision finding that there was no probable cause for Kim's assertions. In addition, the defendants assert that with the exception of a single, conclusory allegation, the claims are time-barred. Finally, the defendants argue that the NCPD must be dismissed because it is a non-suable entity.

## DISCUSSION

### A. Standards of Law

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *See*

*Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 162 (E.D.N.Y. 2010), *aff'd,* 446 F. App'x 360 (2d Cir. 2011) (citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir.2010)). The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss. District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)).

In addition, "in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Id.* (citation and internal quotation marks omitted). "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Id.* (quoting *Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)). In addition, "'[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to

13

establish the fact of such litigation and related filings.'" *Global Network*, 458 F.3d at 157.

(quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d

Cir. 1998)).

In this case, the complaint does not reference the fact that Kim filed a complaint and an

amended complaint with the NYSDHR. However, it is well-settled that the "Court 'may take

judicial notice of the records of state administrative procedures, as these are public records,

without converting a motion to dismiss to one for summary judgment.'" *Johnson v. Cty. of

Nassau*, 411 F. Supp. 2d 171, 178 (E.D.N.Y. 2006) (citing *Evans v. New York Botanical Garden*,

No. 02 Civ. 3591, 2002 WL 31002814, at *4 (S.D.N.Y. Sept.4, 2002); *Dutton v. Swissport USA,

Inc.,* No. 04 CV 3417, 2005 WL 1593969, at * 1 (E.D.N.Y. July 1, 2005)). The defendants have

annexed the NYSDHR decision to their moving papers. Kim does not dispute its authenticity.

Accordingly, the undersigned recommends that the District Court consider the NYSDHR

pleadings and determination and will do so in this report.

### B.    Statute of Limitations

As a threshold matter, the Court will address the defendants' statute of limitations

argument. As noted above, Kim has asserted claims under 42 U.S.C. §§ 1981 and 1983, the 2nd

and 14th Amendments to the United States Constitution, and Section 290 and 296 of the

NYSHRL. ECF No. 1. He has also asserted state law claims for both intentional and negligent

infliction of emotional distress. *Id.* The statute of limitations applicable to his claim brought

under § 1983 is three years. *See Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.

2004) (citing *Wynder v. McMahon*, 360 F.3d 73, 76 (2d Cir. 2004) (§ 1983)). "[T]he statute of

limitations under the NYSHRL is [also] three years." *Sotomayor v. City of New York*, 862 F.

Supp. 2d 226, 248–49 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013). Claims brought

under the 1991 amendments to Section 1981 are governed by the "catchall" four-year statute of limitations prescribed by 28 U.S.C. § 1658. *Fernandez v. M & L Milevoi Mgmt., Inc.*, 357 F. Supp. 2d 644, 649 (E.D.N.Y. 2005) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 1845, 158 L. Ed. 2d 645 (2004)).

With respect to the state law claims, "the statute of limitations in New York for a claim of intentional infliction of emotional distress is one year from the date of the infliction." *Prince v. Cty. of Nassau*, 837 F. Supp. 2d 71, 107 (E.D.N.Y. 2011), aff'd, 563 F. App'x 13 (2d Cir. 2014). "A claim for negligent infliction of emotional distress is subject to a three-year statute of limitations." *AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.,* 361 F. Supp. 2d 312, 317 (S.D.N.Y. 2005) (citing N.Y. C.P.L.R. § 214). However, when state law claims are brought in federal court, the claims are also subject to state procedural rules. *Coggins v. Cty. of Nassau,* 988 F. Supp. 2d 231, 250 (E.D.N.Y. 2013), *aff'd* in part, appeal dismissed in part *sub nom. Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015). "Thus, New York County Law § 52 applies in this case and incorporates the statute of limitations and notice of claim requirements in N.Y. General Municipal Law §§ 50–e and 50–i." *Id.* "Section § 50–i (1) provides that a plaintiff must commence any action against a county for "personal injury" within one year and ninety days from the claim's accrual. *Id.*

The events complained of in this action primarily occurred between 2010 and 2013. Kim commenced this action on May 31, 2019. Accordingly, his Section 1983 and NYSHR claims based on conduct that occurred before May 31, 2016 are time-barred unless he can successfully invoke an exception to the limitations period. Similarly, Kim's Section 1981 claims are barred for conduct occurring before May 31, 2015. Indeed, the defendants argue that apart from his actual termination, the denial of Good Guy Letter and the April 10, 2017 anonymous phone, all

of the other claims alleging race and national origin discrimination or hostile work environment are time-barred. The defendants further contend that any Second Amendment violations alleged by Kim, which accrued prior to May 31, 2016, are also time-barred. Finally, the defendants note that neither of the state law claims are within the applicable statute of limitations.

In response, Kim broadly asserts that his claims are not time barred under the continuing-violation exception. "The continuing-violation exception is most often invoked by plaintiffs alleging claims under Title VII, but it is also applied by courts in employment discrimination cases brought under Sections 1981 and 1983, and under [state law] . . .." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011). Although disfavored in this Circuit, *see Trinidad v. N.Y. City Dep't of Corr*. 423 F. Supp. 2d 151, 165 n. 11 (S.D.N.Y. 2006), under this exception, the commencement of the statute of limitations period may be delayed until the last discriminatory act complained of if a plaintiff has experienced a continuous practice and policy of discrimination. *Bermudez*, 783 F. Supp. 2d at 574 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)). However, "the continuing violation doctrine is [generally] associated with a discriminatory policy, rather than with individual instances of discrimination." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001). Indeed, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Valtchev v. City of New York*, 400 F. App'x 586, 588-89 (2d Cir. 2010); *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (the doctrine does not apply to "discrete [] acts, even where those discrete acts are part of a 'serial violation'"). Moreover, "'[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire'" are "'not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" *Bermudez*, 783 F. Supp. 2d at 574 (quoting *In Nat'l R.R. Passenger Corp. v. Morgan*,

536 U.S. 101, 113–15, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)).  Finally, acts that are

"isolated in time . . . from each other . . . [or] from the timely allegations[ ] as to break the

asserted continuum of discrimination" will not suffice.  *Fitzgerald,* 251 F.3d at 359.

Nonetheless, "a continuing violation may be found where specific and related instances of

discrimination are permitted by the employer to continue unremedied for so long as to amount to

a discriminatory policy or practice." *Id.* (internal quotation marks and citation omitted).

     The factual allegations set forth in the complaint do not support application of the

continuing violation exception.  Kim principally bases his claims on a series of acts that occurred

between 2010 and 2013:  (1) the December 10, 2010 incident when Police Officer Rhatigan

called him a "fucking pale!" (Compl. ¶¶ 100-03); (2) sporadic incidents between 2011 and 2012

involving pictures of the North Korean dictators (*id.* ¶ 84); an incident occurring before 2012 in

which pictures of Long Duck Dong were posted around the station house (*id.* ¶ 42); an undated

incident when a fake 911 call was made to the precinct about an Asian man (*id.* ¶ 99); an incident

in late June 2012, when Police Office Santoro called him "a pale" and accused him of trying to

scam the department (*id.* ¶ 78-9); the denial of the job with the Recruitment Section (*id.* ¶¶ 80-3);

a series of incidents involving the scribbling of juvenile comments on his assignment folder (*id.*

¶¶ 86-9); the unpleasant exchanges with Police Officer Croce in September 2013 (*id.* ¶¶ 90-6);

and Police Officer Theodoropoulos' comments about the Asiana Airline crash in 2013(*id.* ¶¶ 97-

8).  Notably, there appears to be a four year gap between the last factual allegation in 2013 and

the 2017 call during which an unknown male mocked Kim in an Asian accent stating, "ha ha ha,

you won't have a job. You'll be delivering egg rolls, Gook. Ha ha ha." *Id.* ¶ 105.  Indeed, the

fight with Monk, which allegedly led to Kim's termination took place over seven years ago, in

November 2012.  Although the conduct alleged to have taken place between 2010 and 2013 may

be similar to the alleged action in 2017, that similarity alone is insufficient to render continuous what is essentially separate instances of harassment separated by years. In fact, the alleged acts are precisely the type of "discrete discriminatory acts" that "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *See Morgan*, 536 U.S. at 113, 122 S. Ct. 2061 (The Supreme Court has rejected the notion that a continuing violation theory can be applied to discrete acts of unlawful employment practices, stating that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). For these reasons, the Court finds that any Section 1981 claims concerning acts that occurred before May 31, 2015, and Section 1983 and NYSHR claims concerning acts that occurred before May 31, 2016 are time barred.

The Court also agrees that the state law claims fall outside the statute of limitations. Therefore, with the exception of claims based on Kim's actual termination, the denial of Good Guy Letter and the April 10, 2017 anonymous phone, the undersigned respectfully recommends that all of the other claims alleging race and national origin discrimination, work environment or retaliation be dismissed.

### C.      The NYSDHR Determination

The defendants also argue that, even if the claims were not time barred, Kim is precluded from asserting any claims against them pursuant to 42 U.S.C. §§ 1981 and 1983 because Kim presented identical issues and claims to the NYSDHR. "Generally, 'when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts.'" *Visco v. Brentwood Union Free Sch. Dist.*, 991 F. Supp. 2d 426, 432–33 (E.D.N.Y. 2014) (citing *Univ. of Tennessee*

*v. Elliott*, 478 U.S. 788, 799, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986) (internal quotation marks and citation omitted) (alteration in original). According to the defendants, in his NYSDHR complaint, Kim alleged the following:

(1) he was subjected to discrimination, retaliation and a hostile work environment because he is an Asian-American of Korean origin;

(2) he endured multiple racial discriminatory incidents dating back to 2005 that include a call in 2012 with a message stating "you're a pale and you're trying to scam by holding on the call," and pictures posted of the former Korean dictator;

(3) in 2013, someone wrote "very stupid" and "I'm a victim" on his assignment folder and when he complained to Sergeant Tara Cominskey, the EEO officer, he was told that his allegations were not severe or pervasive;

(4) his co-worker Police Officer Monk told him he posted a picture of "Long Duck Dong" a character from the movie Sixteen Candles who is offensive to Asians;

(5) on November 25, 2012, he was attacked by Monk, who threw him to the floor and directed punches at him;

(6) after the incident he began pacing to calm himself down and tripped over a step and broke his hand;

(7) he was subjected to a disciplinary hearing which focused on his hand injury and it was recommended by the hearing officer that he and Monk be suspended for four months;

(8) the then Acting Police Commissioner Krumpter disregarded the recommendation and decided to terminate him and forced him to sign a Release that permitted him to remain employed for the following four months so that he could complete his twenty year requirement to receive his full pension benefits; and

(9) he was not given a Good Guy Letter and was limited to the use of ten sick days for his final four months.

Defs.' Mem. 8-9; Rogers Decl. Exs. C, D. The defendants also note that Kim's Amended NYSDHR Complaint and the complaint filed in the instant action rely on the same allegations to support the section 1981 and 1983 claims. *Id.* The NYSDHR determined that Kim had released

all potential claims against them that existed prior to the December 23, 2016 execution of the Release and that the April 10, 2017 incident involving the anonymous phone call was properly investigated.

Nonetheless, the Supreme Court and courts within this Circuit have made clear that an NYSDHR decision does not preclude an employment discrimination claim absent judicial review in state or federal courts. *Visco*, 991 F. Supp. 2d at 433 (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991); *Murphy v. Suffolk Cty. Cmty. Coll.,* No. 10–CV–0251, 2011 WL 5976082, at *7 (E.D.N.Y. Nov. 29, 2011) ("[U]nreviewed state administrative findings have no preclusive effect on federal court proceedings."). There is nothing in the defendants' papers to suggest that the NYSDHR Determination and Order After Investigation was reviewed in the state or federal court. Accordingly, the defendant's collateral estoppel argument is without merit.

### D.     The Stipulation and Release

There is merit, however, to the defendants' waiver argument. Specifically, the defendants contend that when Kim signed the Release on December 23, 2016, Kim waived all of the claims that had accrued on or before that date, including the claims that are related to his termination, hostile work environment, retaliation and the denial of the Good Guy Letter. "'A plaintiff may waive a statutory claim for discrimination as long as it is done knowingly and voluntarily.'" *Drees v. Cty. of Suffolk,* No. 06-CV-3298 JFB ETB, 2007 WL 1875623, at *9 (E.D.N.Y. June 27, 2007)(quoting *Shain v. Ctr. for Jewish History*, No. 04-CV-1762 (NRB), 2006 WL 3549318, at *3 (S.D.N.Y. Dec. 7, 2006)). The Second Circuit utilizes a "totality of the circumstances" test to determine whether a waiver is voluntary. *Id.* "'Factors to be considered include: (1) plaintiff's education and business experience; (2) the amount of time plaintiff had

possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether plaintiff was represented by or consulted with an attorney'; and (6) 'whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled to under contract.'" *Id.* (citing *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998)). However, under New York law, the release "need only be clear, unambiguous, and knowingly and voluntarily entered into." *Id.*

Although this case is only at the motion to dismiss stage, Kim's pleading provides a great deal of information upon which the Court can analyze those factors. It is clear from the complaint that Kim had close to twenty years of experience as police officer, having served eight years with the New York City Police Department and twelve years with the NCPD. Compl. ¶¶ 15-7. Kim also asserts in the complaint that, at some point, following Kim's disciplinary hearing in 2015, Krumpter chose to terminate him, effective immediately, rather than adopting the hearing officer's recommendation that Kim be suspended for four months. Compl. ¶ 55. On December 23, 2016, Kim signed the Release but only after he had met several times with an attorney and his union representative. *Id.* While counsel for Kim suggests in an unsworn statement that Kim was not given the opportunity to think about signing the agreement, *see* Pl.'s Mem. 10, according to the allegations in the complaint, it was not until Krumpter meet with Kim's counsel, who had been provided to him by the Police Benevolent Association, and a union representative, that Kim was even given the option to sign the Release permitting him to remain employed to April 16, 2017. *Id.* ¶¶ 55-6. Kim was then advised by his union representative that if he wanted to remain on the force to complete his twenty year requirement and receive full pension benefits, he had to sign the Release. *Id.* ¶¶ 57-8.

Moreover, the plain language of the Release makes it clear that Kim would be barred from bring a suit against the defendants for any claims arising out of the disciplinary proceeding. *See* Rogers Decl., Ex. B. In addition, the Release contains a more general clause, stating that Kim discharges Nassau County and its employees from all manners of actions, proceedings, and causes of action arising out of any federal, state or city constitution [or] statute. *Id.* Finally, it is clear from the allegations that Kim was given consideration in exchange for the waiver. Indeed, Kim asserts that in exchange for signing the Release and waiving his future rights, his employment was extended by four months to provide him with full pension benefits which he would have otherwise lost. Compl. ¶¶ 57-8.

Kim does not challenge the clarity of the agreement or dispute that he was represented. Instead, Kim now argues that the Release should not be enforced because it was signed under duress. Specifically, Kim claims that he was coerced into signing the Release because he was informed that he would be "terminated immediately and thus [] would lose all of this his twenty years (20) years of service." *Id.* ¶58. "In order to establish that the [R]elease is voidable on the ground of economic duress, [Kim] must show that "the agreement was obtained: (1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative.'" *Nicholas v. Nynex, Inc.*, 929 F. Supp. 727, 732–33 (S.D.N.Y. 1996). Kim cannot establish these elements because he faced termination regardless of whether he signed the Release. His choice was simply to depart with his termination pay, his pay for unused sick time and the right to bring any discrimination claims or to remain employed for an additional four months so he could enjoy the benefit of a full pension. While the Court recognizes that the choice may not have been an easy one for someone facing the uncertainties of unemployment, there is no indication that Kim was unable to

22

make the decision of his own free will.  *See EEOC v. American Express Publishing Corp.*, 681 F. Supp. 216, 219 (S.D.N.Y.1988) ("[T]he fact that a party faces a difficult choice—between additional benefits or pursuing his legal rights—does not alone indicate lack of free will."). Therefore, the undersigned recommends that the defendants' motion to dismiss also be granted to the extent Kim seeks to challenge his termination.

It is not clear, however, if the denial of Good Guy Letter occurred prior to December 23, 2016.  In addition, the allegations based on the April 10, 2017 anonymous phone are not covered by the Release.  Accordingly, those two remaining events will be analyzed for sufficiency under section 1981 and 1983.[3]

## E.      Section 1981

Section 1981 provides that:

> [a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42 U.S.C. § 1981.  "Claims of employment discrimination under Section 1981 are analyzed under the same framework that applies to . . . claims under Section 1983."  *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011).  "When the defendant is a state actor, [however,] Section 1983 is the exclusive remedy for violations of rights guaranteed under Section 1981."  *Id.* (citing *Gladwin v. Pozzi*, 403 Fed. Appx. 603, 604–05 (2d Cir. 2010).  Thus,

---

[3] Given that Section 1981, 1983 and NYHRL claims are analyzed according to the same standard, it follows that the Court's conclusion regarding the sufficiency of the 1981 and 1983 claims would apply to Kim's discrimination and retaliation claims brought under the state law.  However, as previously noted, New York law imposes the additional requirement that a party suing a county must serve a notice of claim within ninety days after the claim arises. *Germain v. Cty. of Suffolk*, No. 07-CV-2523 ADS ARL, 2009 WL 1514513, at *8 (E.D.N.Y. May 29, 2009).  There is no indication in the complaint or the papers submitted in opposition to the motion that Kim has done so.  Nor does he address the NYHRL claims in his memorandum.  Accordingly, the undersigned further recommends that the NYHRL claims against be dismissed.

the section 1981 claims against the County[4] or Krumpter, Cominskey and Monk in their official capacities must be brought under Section 1983 and, thus, the undersigned recommends that those claims be dismissed. *Patterson*, 375 F.3d at 226 (when the defendant sued for discrimination under § 1981 is a municipality or an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom). The Court, therefore, turns to Kim's section 1981 claims against the defendants in their individual capacities.

1. Kim's Section 1981 Discrimination Claims

"To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Albert v. Carovano*, 851 F.2d 561, 571–72 (2d Cir. 1988) ("Essential to an action under Section 1981 are allegations that the defendants' actions were purposefully discriminatory, and racially motivated."). Among the activities enumerated in the statute is the ability to make and enforce contracts, which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b). Moreover, an individual may be held liable under §1981 only if that individual is "personally involved in the alleged deprivation." *Littlejohn*

---

[4] The Court takes this opportunity to note that the NCPD is not a suitable entity. "It is well-established that under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Allen v. New York*, No. 15-CV-3653, 2015 WL 6507477, at *3 (E.D.N.Y. Oct. 27, 2015). Accordingly, the undersigned further recommends that the claims against the NCPD be dismissed.

*v. City of New York,* 795 F.3d 297, 314 (2d Cir. 2015); *see also Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 225 (E.D.N.Y. 2018) ("In order to plead a claim for individual liability under § 1981, a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.).

With respect to the remaining claims, Kim first contends that the only reason Krumpter denied him a Good Guy Letter is because he is Asian American and South Korean and had filed complaints pursuant to EEO policies and procedures about the harassment and discriminatory treatment by all of the defendants. *Id.* ¶ 65. Aside from his refusal to adopt the hearing officer's recommendation that Kim be suspended rather than terminated, the only allegation directly attributable to Krumpter was his 2013 comment to Losquandero in which Krumpter is alleged to have said "Why should I help [Kim]?" "He's a Gook and a malingerer." Compl. ¶ 96. In determining whether to consider isolated "stray remarks" as probative of discriminatory intent, the Second Circuit has advised:

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. . .. The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Absent more, Krumpter's comment is far too remote to be considered in connection with the denial of the Good Guy Letter. In addition, nothing in the complaint suggests that either Cominskey or Monk were involved the decision to deny Kim the letter. Accordingly, to the extent the complaint contains comments that can be attributed to Cominskey and Monk[5], those comments would not support a finding that the defendants discriminated against Kim when they denied him a Good Guy Letter.

---

[5] It warrants mention that there are no facts in the complaint to support Kim's characterization of Monk as a supervisor.

Similarly, Kim's allegations surrounding the April 10, 2017 phone call are insufficient to state a claim for discrimination against Krumpter, Cominskey or Monk under section 1981. According to Kim, the phone call was made by an unknown male caller who mocked him in an Asian accent stating, "ha ha ha, you won't have a job. You'll be delivering egg rolls, Gook. Ha ha ha." Compl. ¶ 105. Indeed, Kim acknowledges in his complaint that he did not recognize the voice. *Id*. ¶ 106. Albeit offensive, Kim has not alleged any facts that could connect the call to one of the remaining defendants.

### 2.    Kim's Section 1981 Hostile Work Environment Claim

For similar reasons, Kim's section 1981 hostile work environment claim must fail. To state a claim for a hostile work environment, Kim must allege that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Bermudez*, 783 F. Supp. 2d at 578–79 (citing *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "Courts must look at the totality of the circumstances to determine whether an environment is "hostile" or "abusive" and should consider the following nonexclusive list of factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's "work performance." *Id.* Moreover, the "incidents of allegedly offensive conduct must also be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62, 75 (2d Cir. 2001).

As previously stated, Kim's hostile work environment claim is predicated on incidents that primarily took place over seven years. Kim states that he was called him a "fucking pale" in

2010 and again in 2012, was subjected to postings of racial images and phony phone calls between 2011 and 2012, was denied a job with the Recruitment Section in 2012, was ridiculed when someone scribbled juvenile comments on his assignment folder in 2013; was demeaned by Krumpter in 2012 and Police Officer Croce in September 2013 and was offended by Police Officer Theodoropoulos' comments about the Asiana Airline crash.  Compl. ¶¶ 42, 80-4, 86-9, 90-6, 97-9, 100-03.  However, each of the above-mentioned incidents occurred outside the statute of limitations.  Accordingly, the Court must determine if the 2017 call was so severe that it alone created a hostile work environment.  *See De La Pena v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 415 (E.D.N.Y. 2013), aff'd, 552 F. App'x 98 (2d Cir. 2014) ("[I]t has been held that 'if the alleged conduct is 'extraordinarily severe,' a single incident . . . may create a hostile environment.'").

Kim alleges that a few days before his departure from the NCPD, he received a call from an unknown male caller who mocked him in an Asian accent stating, "ha ha ha, you won't have a job. You'll be delivering egg rolls, Gook. Ha ha ha." Compl. ¶ 105.  Although that statement is certainly offensive, without more specificity, it is not sufficient to create a hostile work environment.  Moreover, as noted above, the call cannot be attributed to any of the defendants and there is certainly nothing in the pleading to suggest that the conditions of Kim's employment were altered by virtue of the call as it was made a few days before his negotiated departure date.  Accordingly, the Court considers the April call to be a stray remark, by an unknown caller, and recommends that the section 1981 hostile work environment claim be dismissed.

3.      Kim's Section 1981 Retaliation Claim

Finally, Kim's 1981 retaliation claim appears to be centered around his 2013 complaints to  Cominskey, which she dismissed, *see* Compl. ¶ 50, as well as Krumpter's reaction to learning

that Kim had launched complaints against his fellow officers when he requested a transfer. *Id.* ¶ 96. Specifically, Kim alleges that after Cominskey informed Krumpter that Kim had alleged "multiple incidents of harassment and discriminatory treatment," Krumpter stated, "Why should I help him?" "He's a Gook and a malingerer." *Id.;* see also Pl.'s Mem at 19-20. "To meet the burden for a retaliation claim at the initial stage of a proceeding, 'a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 516–17 (E.D.N.Y. 2019) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 315-6 (2d Cir. 2015)). Because of the lack of temporal proximity between the alleged protected activity – complaining to Cominskey about harassment in 2013 —and the alleged retaliatory events- the denial of the Good Guy Letter and the April 2017 anonymous phone call, Kim cannot satisfy the causal connection element. Thus, the undersigned also recommends that the section 1981 retaliation claim must be dismissed.

**F.    Section 1983**

1.    Kim's Section 1983 Claims Against Krumpter

Kim also alleges that he has protected property interest in his firearms license, which was taken away from him by virtue of Krumpter's unreasonable denial of his right to a Good Guy Letter. Compl. ¶¶ 163-68. Kim, therefore, contends that he has been denied his rights to due process as well as his right to bear arms and to equal protection. *Id.* As a threshold matter, the Court notes that in order to state a claim under 42 U.S.C. § 1983 against an individual defendant, Kim must allege that he was acting under color of state law and that his conduct deprived him of a constitutional or a federal statutory right. *Bermudez*, 783 F. Supp. 2d at 574–75 (citing

*Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004)). The defendants do not

dispute that Krumpter was acting under the color of state law. They do, however, take issue with

Kim's claim that he has been deprived a right, privilege or immunity secured by the Constitution.

The Court will address each of the alleged constitutional deprivations in turn.

a.    Due Process

 "'A procedural due process claim is composed of two elements: (1) the existence of a

property or liberty interest that was deprived and (2) deprivation of that interest without due

process.'" *Perros v. Cty. of Nassau*, 238 F. Supp. 3d 395, 400–01 (E.D.N.Y. 2017) (quoting

*Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012)). "To establish [a] deprivation

of a property interest, a plaintiff must demonstrate an interest 'in a benefit that is more than an

abstract need or desire for it . . . [He] must, instead, have a legitimate claim of entitlement to it'

under state or federal law in order to state a § 1983 claim." *Id.* (citing *Finley v. Giacobbe,* 79

F.3d 1285, 1296 (2d Cir. 1996) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct.

2701, 33 L. Ed. 2d 548 (1972)). The Supreme Court has held that "a benefit is not a protected

entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock

v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005).

In New York, licensing officers are vested with broad discretion in making the

determination to issue or deny a pistol permit. *See Simmons v. New York City Police Dep't

License Div.,* 35 A.D.3d 748 (2d Dep't 2006); *Dorsey v. Teresi,* 26 AD3d 635, 636 (3d Dep't

2006). Indeed, under New York law, "the possession of a handgun license is a privilege, not a

right." *Perros*, 238 F. Supp. 3d at 400–01 (citing *Papaioannou v. Kelly*, 14 A.D.3d 459, 788

N.Y.S.2d 378, 378 (1st Dep't 2005)). In addition, here, it is undisputed that Krumpter's decision

to provide Kim with a Good Guy Letter was discretionary. Thus, Kim cannot establish that he

has a protected property interest the letter.

"Moreover, even if [Kim] did have such a property interest, adequate procedures were available to him to challenge the denial of the Good Guy Letter in, for example, an Article 78 proceeding in state court." *Moore v. City of New York*, No. 15 CIV 6600 GBD JLC, 2018 WL 4043145, at *6 (S.D.N.Y. Aug. 7, 2018). "[T]here is no constitutional violation . . . when there is an adequate state post deprivation procedure to remedy a random, arbitrary deprivation of property or liberty." *Id.* (citing *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 882 (2d Cir. 1996). Accordingly, to the extent Kim has asserted a procedural due process claim against Krumpter, the undersigned recommends that the claim be dismissed.

b.      Second Amendment

"The Second Amendment provides: 'A well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'" *Henry v. Cty. of Nassau*, 444 F. Supp. 3d 437, 443 (E.D.N.Y. 2020) (quoting U.S. Const., amend. II.) "Two recent Supreme Court cases, *District of Columbia v. Helle*r and *McDonald v. City of Chicago,* [have] explored the reach of the Second Amendment." *Id.* Of particular note, in *Heller*, the Supreme Court held that "the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home." *D.C. v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). However, the "right secured by the Second Amendment is not unlimited." *Freund v. Cty. of Nassau,* No. CV 15-6180, 2017 WL 750480, at *3 (E.D.N.Y. Feb. 24, 2017). Indeed, "case law within this circuit indicates that 'the right to bear arms is not a right to hold some particular gun.'" *Perros*, 238 F. Supp. 3d at 401(quoting *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 217 (S.D.N.Y. 2005)).

In this case, Kim does not claim that the denial of a Good Guy Letter has prevented him from obtaining a gun license to own, for example, a shotgun or a rifle. In fact, Kim has failed to allege that he was prevented from obtaining a pistol permit and a license as a civilian. New York Penal Law § 400.00(1) "sets forth the eligibility requirements for obtaining a license [and] allows a licensing officer to "deny an application for any good cause." *Corbett v. City of New York,* No. 18 CIV. 7022 (KPF), 2019 WL 2502056, at *7 (S.D.N.Y. June 17, 2019), aff'd, 816 F. App'x 551 (2d Cir. 2020) (citing *Tuttle v. Cacace,* 81 N.Y.S.3d 195, 196 (2d Dep't 2018)). The Good Guy Letter refers to a letter that the NCPD issues certifying, in effect, that a retired police officer is in good standing. However, "retired police officers are subject to the same regulations and must also demonstrate "proper cause" prior to receiving a license." *Id.* Implicit in Kim's argument is his belief that licensing officials would have ignored the NYPL and freely issued him a firearm license had he had a Good Guy Letter. Indeed, Kim asserts that '[u]pon information and belief, when the applicant is a former police or peace officer, the Nassau County Police Department Pistol Licensing Bureau looks for and heavily considers . . . Good Guy Letter forms." Compl. ¶122. Accordingly, Kim's Second Amendment contentions cannot survive a motion to dismiss.

c.      Equal Protection

Finally, Kim also argues that Krumpter violated his equal protection rights in that similarly situated, non-Asian American NCPD employees who retire are issued Good Guy Letters. To state an equal protection claim, Kim must allege that he was "treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Perros*, 238 F. Supp. 3d at 404. Kim's sole allegation, in this regard, is that Krumpter "do[es] not treat similarly-situated retirees, white police officers, in the same fashion as Kim." This conclusory

allegation is insufficient to sustain the motion to dismiss.  Accordingly, the undersigned further recommends that the equal protection claim asserted against Krumpter be denied.

2.      Kim's 1983 Claims against the County and Krumpter in his official capacity

Finally, Kim alleges that Krumpter's denial of the Good Guy Letter was part of the pattern, practice, and policy of the County evident, for example, by the County's alleged use of the letter "Y" for yellow on internal records to identify Asian-American officers employed within the County.  Compl. ¶¶ 170-71.  Kim also assert that the County is liable for negligently supervising, failing to train and disciplining its officers, which allowed "named and unnamed individual defendants to engage in the conduct which proximately caused" Kim's injuries.  *Id.* ¶ 205.  Finally, Kim alleges that prior to his "wrongful termination" on April 16, 2017, the County permitted a pattern of unjustifiable, unreasonable and unequal treatment of minority classes employed by the NCPD, including allowing for the proliferation of wrongful terminations, denial of Letters of Good Standing and the inhuman treatment of other fellow officers who are of a minority class.  *Id.* ¶¶ 208-11.  However, as the Court noted above, most of the incidents giving rise to Kim's failure to train allegation are time barred and Kim's discrimination and retaliation claim with respect to his termination has been waived.  Therefore, the Court only addresses the municipal liability with respect to the denial of Good Guy Letter and the April 10, 2017 anonymous phone call.

"[S]ection 1983 'extends liability to a municipal organization where . . . the policies or customs it has sanctioned, led to an independent constitutional violation.'" *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F. Supp. 3d 386, 409–10 (E.D.N.Y. 2018) (quoting *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)). "'Municipal liability may also be premised on a failure to train employees when inadequate training reflects deliberate indifference to . . .

constitutional rights.'" *Id.* (quoting *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009)). "To prevail on a Section 1983 claim against a municipality, a plaintiff must show 'that 'action pursuant to official municipal policy' caused the alleged constitutional injury.'" *Id.* (quoting *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011)). Finally, "[a] plaintiff can establish the existence of a municipal policy or custom by showing: the existence of [ ] (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees." *Id.*

Addressing first the denial of the Good Guy Letter, Kim claims that the County and Krumpter discriminated against him on the basis of his race, in violation of the Due Process Clause, the Second Amendment and the Equal Protection Clause. As stated above, Kim has not established a property interest in the Good Guy Letter so as to sustain a due process violation. Nor has he established that the denial of the letter resulted in a complete ban on his right to carry a firearm. Finally, while Krumpter appears to have had decision making authority, Kim has not provided any facts to support his conclusory allegations that the County freely offered Good Guy Letters to white officers. Similarly, standing alone, the anonymous April phone call cannot support Kim's claims for negligent supervision and training. Accordingly, the undersigned recommends that Kim's section 1983 claims be dismissed.

**OBJECTIONS**

A copy of this Report and Recommendation is being electronically served by the Court on the parties. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS 28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C*., 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997).


Dated: Central Islip, New York
      October 2, 2020

                                    _____/s_____

                                      ARLENE R. LINDSAY
                                      United States Magistrate Judge